Sinnott, Judge,
delivered the opinion of the court:
Plaintiff herein seeks to recover from defendant the sum of $54,081.60, in connection with a certain contract which was entered into on August 19, 1919, with the United States for dredging in the Schuylkill River at Philadelphia. Plaintiff’s claim consists of five items:
1. For slope dredging_$15, 000. 54
2. For meals furnished Government employees_ 170.20
3. Excess deductions made for ’ inspection and superin-tendence_ 198.14
4. Withheld for superintendence and inspection charges- 2, 822.46
5. Ledge rock excavation_ 35, 896. 26
Total_ 54, 087.60
The above item (1), $15,000.54, was approved by the contracting officer and by the Chief of Engineers of the United States Army. The Comptroller General of the United States also held that payment of said item was proper. (Finding V.)
Item (2), $110.20, was found to be correct and due plaintiff by the contracting officer, and this finding was approved by the Chief of Engineers of the United States Army, but was allowed by the Comptroller General of the United States in the sum of $150.60 only. (Finding YI.)
Item (3), $198.14, was allowed by the War Department and also by the Comptroller General of the United States. (Finding VII.)
Item (4) was recommended to be paid plaintiff by the contracting officer, with the approval of the Chief of Engineers, which recommendation was disapproved by the Comptroller General of the United States, who approved the recommendation only in the sum of $1,626.31.
The above four items, aggregating $18,191.34, make up the sum allowed plaintiff in our conclusion of law herein. *637 Notwithstanding the disallowance by the Comptroller General of item (4), except for the snm of $1,626.37, we think the full amount of $2,822.46 should be allowed the plaintiff. This amount was recommended for payment by the contracting officer, with the approval of the Chief of Engineers. Article 5 of the contract here involved, set forth in Finding VIII, provides:
“ The findings of the contracting officer approved by the Chief of Engineers, shall be accepted by the parties hereto as final.”
Said article 5, as set forth in Finding VIII, further provides:
“ That no charge for inspection and superintendence shall be made for such period after the date fixed for completion of this contract, as, in the judgment of the contracting officer, approved by the Chief of Engineers, shall equal the time which shall have been lost through * * *, or other unforeseeable cause of delay arising through no fault of the contractor, and which actually prevented such contractor from delivering the material or commencing or completing the work within the period required by the contract.”
From the last payment made to the contractor there was withheld the sum of $2,822.46, which constitutes item (4), designated as “ amount withheld pending determination of extension of time to be allowed for the completion of the contract beyond the time limit originally fixed and the corresponding adjustment of cost of superintendence and inspection.”
The above reference is to plaintiff’s delay in completing the work required under the contract because of its inability to secure coal necessary for the operation of its dredges due to a coal shortage. Plaintiff applied to the contracting officer for authority to suspend work or dredging because of said shortage. This request was granted. The contracting officer experienced like difficulty in securing coal for the Government’s own dredges. The contracting officer recommended the payment to plaintiff of the said amount of $2,822.46. This recommendation was concurred in by the Chief of Engineers, who expressly found that plaintiff’s inability to secure coal was an unforeseeable cause of *638 delay within the meaning of article 5 of the contract. Notwithstanding this action on the part of the contracting officer and the Chief of Engineers the Comptroller General refused to allow payment of said sum of $2,822.46. As the contract specifically provided that “ The findings of the contracting officer, approved by the Chief of Engineers, shall be accepted by the parties hereto as final,” the action of the Comptroller General was unauthorized, there being no question of good faith involved. Yale & Towne Mfg. Co. v. United States, 58 C. Cls. 633; Penn Bridge Co. v. United States, 59 C. Cls. 892; Empire Engineering Co. v. United States, Id. 904; United States v. Mason & Hanger Co., 260 U. S. 323, 67 L. Ed. 286.
We may add that this item (4), as well as items (1), (2), and (3), are not contested in defendant’s brief. The real controversy involves item (5), $35,896.26, for ledge rock excavation.
Plaintiff contends that it was compelled to remove ledge rock which was not required by the terms of the contract. Defendant contends that the contractor was not directed to remove ledge rock but was required to remove only the overburden, or overlying material, as specified in the contract. The pertinent provisions of the specifications upon which plaintiff bid are set forth in Finding IX. They notified the contractor of the test probings made by defendant, how they were made, and that “ the material encountered above the proposed grade of the bottom was soft mud, firm mud, clay, hard sand, and gravel. Rock was encountered, generally below grade, in some of the probings.” Also that—
“ The material to be removed is believed to be as stated above, but bidders are expected to examine the work and decide for themselves as to its character, as the United States does not guarantee that the results of these test probings represent the exact character of all the material that will be encountered during the progress of the work.”
The specifications required—
“ * * * removal and disposition of all material encountered, except ledge rock. The removal of ledge rock, if found, will not be required; such work, if necessary, will be *639 made the subject of separate contracts. Material to be classified as ledge rock must be of such composition as, in the opinion of the contracting officer, shall require blasting for its removal and shall not include fragments of rock or boulders capable of being raised by the dredge in one piece.
“ Should ledge rock be encountered, the contractor shall remove therefrom all such overlying materials as, in the judgment of the contracting officer, can be removed by the use of the plant specified in the accepted proposal, or the equivalent of such plant.”
It will be seen from the above excerpt from the specifications that plaintiff was required to remove all of the material encountered except ledge rock; that ledge rock must be of such composition as in the opinion of the contracting officer shall require blasting for its removal, and shall not include fragments of rock or boulders capable of being raised by the dredge in one piece; and further, that should ledge rock be encountered plaintiff was required to remove therefrom all such overlying materials as, in the judgment of the contracting officer, could be removed by the use of the plant specified.
Plaintiff pursued the work of dredging for about a year without trouble, when in October, 1920, it claimed to have encountered ledge rock. No diver was sent down to examine and determine whether it was ledge rock. Plaintiff did not resort to blasting to remove the alleged ledge rock. Whatever rock was removed was removed by dredges. Plaintiff’s two witnesses, Nortman and Walthauser, testified that they were ordered by the Government engineers to dredge ledge rock. This was denied by defendant’s witnesses, five in number, consisting of the contracting officer Ladue, Chief Engineer Shuman, Engineer in Charge Flynn, Inspector Hubbard, and Inspector Nook, who testified that the orders given to plaintiff were to continue dredging and remove the “ overburden,” which is defined by the engineers to be such overlying loose material as is found upon a layer of rock at the bottom of a stream.
This, no doubt, is what is referred to in the specifications as “ overlying materials.” We are more impressed with the *640 testimony of these five witnesses than we are with thex testimony of plaintiff’s witnesses. Their positive testimony is that orders were not given to dredge the ledge rock, but to continue to remove the overburden. They are borne out and corroborated by the fact that for three months after plaintiff complained of the ledge rock its dredges continued to bring up mud, sand, gravel, and other overlying materials. All of the rock which plaintiff claims to be ledge rock, with the possible exception of less than a dozen large pieces, plaintiff carried away to a dumping ground through a twenty-inch suction pipe. It is no doubt true that plaintiff’s dredge encountered and broke off some projections or pinnacles of ledge rock. This, however, was incidental to the main operation, due probably to the irregular contour of the underlying ledge. To what extent rock was broken from the ledge by the plaintiff’s dredge, or whether the large pieces were overlying material shaled or detached from the ledge prior to plantiff’s contract, the evidence does not disclose.
The rock in question was’ certainly not ledge rock under the definition of the specifications, which did not include as ledge rock fragments of rock or boulders capable of being raised by the dredge in one piece. Blasting was not resorted to. Furthermore, the rock in question was not ledge rock in the opinion of the contracting officer to whom was left the decision as to whether the overlying materials could be removed by the use of the plant specified in the accepted proposal. (Finding IX.)
Judgment should be awarded in the sum of $18,191.34. It is so ordered.
Green, Judge; Moss, Judge; Graham, Judge; and Booth, Chief Justice, concur.
*655 During and prior to the year 1921 plaintiff’s predecessor was a corporation existing under the laws of the State of Delaware under the name of Lunn & Sweet Company. In the year 1923 the said corporation was reorganized under the laws of the State of Maine under the name of Lunn & Sweet (Inc.). This corporation assumed all the assets and liabilities of its predecessor, the Lunn & Sweet Company, and continued in business until the year 1925, when it was reorganized under the laws of the State of Maine as McLaughlin-Sweet (Inc.). This corporation assumed all the assets and liabilities of its predecessor, and in January, 1927, changed its corporate name to Alfred J. Sweet (Inc.).
II. Auburn, Maine, is a town of about 18,000 inhabitants situated opposite Lewiston, a town of approximately 35,000 population, on the Androscoggin Liver. These two towns form one community and are known as the “ Twin Cities.” The shoe factories of Auburn, the manufacturing of shoes being the chief industry of that city, furnish employment to from 6,000 to 6,500 persons. Until 1921 Auburn had no community recreational center.
TII. The plaintiff employed in its factory about 1,200 persons. Of that number approximately sixty-five per cent were male and thirty-five per cent were female. That same ratio has existed since the year 1921. Prior to 1921 the plaintiff was subjected to a large labor turnover among its employees, and particularly among its junior executives, of which there were from fifty to sixty. This same condition existed in all of the factories in Auburn and Lewiston during the period of the World War and until 1921. During the years 1920 and 1921 the labor unrest in Auburn and Lewiston was in part due to the operation of a labor organization that came to Auburn and enrolled a large number of factory employees. Its activities were chiefly among the factory hands as distinguished from the executives and junior executives. A strike was called in one of the factories and there existed a general feeling of uneasiness and unrest in all of the factories in the two cities. The need of a recreational center was recognized, and it was the consensus of the opinion of the business men of Auburn that' a Y. M. C. A. *656 would best solve the problem. In 1921 a campaign for funds for the construction of a Y. M. C. A. by popular subscription was initiated through the Auburn Chamber of Commerce. Alfred J. Sweet, president of the plaintiff corporation, who with the members of his immediate family owned 20,000 of the 22,500 shares of the common stock of the plaintiff corporation, was the chairman of the so-called initial gifts committee and was the active chairman of the campaign in connection with the raising of funds.
IY. At a time prior to 1921 the plaintiff corporation had purchased a tract of land adjoining its factory with the intention of erecting thereon a recreation hall for its employees. However, before the construction of this hall was begun the movement for the erection of a community Y. M. C. A. in Auburn was started by the chamber of commerce, and the plaintiff abandoned its own plans in favor of a community Y. M. C. A.
Y. The campaign for funds was successful and as a result the general Y. M. C. A. for Auburn and Lewiston was built. The cost of the project was approximately $275,000. The industries of Auburn, contributed approximately fffty per cent of that amount, the industries of Lewiston ten per cent, and the remaining forty per cent was obtained through miscellaneous subscriptions. The plaintiff corporation subscribed $22,500.
VI. The Y. M. C. A. at Auburn has all of the characteristics- of a general Y. M. C. A., including a gymnasium, swimming pool, bowling alleys, pool and billiard rooms, social rooms, and has dormitory facilities for from eighty to eighty-five persons. It was dedicated in 1922, and for six months thereafter was a member of the National Council of Y. M. C. A. but later severed its connection with that organization. Its membership is derived from residents of both Lewiston and Auburn. It is nonsectarian and any male person of good moral character of eighteen years of age or over is eligible to a full voting membership in the association upon payment of the membership fee as fixed by the by-laws. It is not self-supporting; the annual cost of operation and maintenance is approximately $40,000. *657 There is usually an annual deficit of the sum of $16,000. Approximately fifty per cent of that annual deficit is taken care of by the industries of Auburn, and the remaining fifty per cent is taken care of by public subscription.
Irrespective of membership the Y. M. C. A. supervises and encourages competitive baseball and basketball teams between the employees of the several industries of the community, and its gymnasium is available for their games and their practice. During the winter months lectures on vital topics are given in the Y. M. C. A. auditorium. Technical courses on phases of the shoe industry are also given. Facilities of the Y. M. C.-A. are made available to the employees of the several factories in turn for their so-called “ factory nights ” upon which occasions the employees present such entertainments as they may desire. No charge is made by the Y. M. C. A. for the use of its facilities on that night, and the factories themselves bear the cost of whatever refreshments are served.
VII. Since 1921 the plaintiff’s labor difficulties have decreased. The employees’ absence on account of intoxication has become less frequent and there has been a pronounced decrease in the labor turnover, particularly among the junior executives, and a general and pronounced improvement of morale among the employees of the factories has been obvious. The plaintiff corporation had formerly followed the practice of bringing its junior executives to Auburn from other places, but in recent years has adopted the policy of recruiting, educating, and training its junior executives from the native population of the community.
VIII. There is located at Lewiston a Y. W. C. A. which devotes its attention to community playground and community-service work at Lewiston and at Auburn. There is also located at Lewiston the Maine Central Hospital, which is a nonsectarian institution available to the residents of Lewiston and Auburn. No special consideration is given to the plaintiff’s employees at that hospital, but many receive treatment there. These employees pay personally for such ti-eatment as they may receive. The hospital is not *658 self-supporting, and the annual deficits are made up by local contributions.
The Androscoggin County Y. M. C. A. operates in communities where there is no local Y. M. C. A. or cooperates with local organizations along special lines, such as summer camps, athletic games, and exhibitions.
During the fiscal year ending November 30, 1921, the plaintiff’s predecessor, Lunn & Sweet Company, paid in $16,875 on its subscription to the Y. M. C. A. It contributed $500 to the Y. W. C. A. at Lewiston, $200 to the Androscog-gin County Y. M. C. A., and $2,500 to the Maine Central Hospital at Lewiston. It was the policy of the plaintiff corporation to contribute to practically all civic projects and charities of Auburn.
IX. The plaintiff’s predecessor, Lunn & Sweet Company,, duly filed its income and excess-profits return for the fiscal year ended 1921, and paid the tax disclosed therein. On January 6, 1925, the Commissioner of Internal Kevenue assessed against Lunn & Sweet (Inc.) an additional tax of $22,023.72, which sum, plus interest of $4,895, was paid by plaintiff’s predecessor, McLaughlin-Sweet (Inc.), under protest on July 23, 1926. The said additional tax of $22,023.72 included the tax on the contributions referred to in Finding VIII hereof.
X. In arriving at its taxable net income reported in its return for the fiscal year ended November 30,1921, the Lunn & Sweet Company deducted from gross income as ordinary and necessary business expense the amount of its contributions made during the year as set forth in Finding VIII hereof. These deductions were disallowed by the Commissioner of Internal Revenue by letter addressed to plaintiff under date of April 1, 1926. Claim for refund filed by plaintiff November 16, 1926, in the sum of $22,023.72 was rejected by the Commissioner of Internal Revenue February 7, 1927.
XI. It has been stipulated by counsel that—
“(A) If the court should find that the amounts paid by plaintiffs to the Auburn Y. M. C. A. and the Central Maine Hospital were proper deductions from net income for the *659 year 1921, the amount refundable to plaintiff is $9,142.48 and interest.
“(B) If the court should find that the amounts paid by plaintiffs in the year 1921 to the Auburn Y. M. C. A. was a proper deduction from net income, but the amount paid to the Central Maine Hospital was not a proper deduction, the amount refundable to plaintiff is $7,992.48 and interest.”
The court decided that plaintiff was not entitled to recover.
Moss, Judge,
delivered the opinion of the court:
Plaintiff’s predecessor, Lunn & Sweet Company, a corporation existing under the laws of the State of Delaware, filed its income and excess-profits tax return for the fiscal year ending November 30,1921, in which it claimed as deductions from gross income the following contributions: To the Y. M. C. A., $16,875.; to the Y. W. C. A. at Lewiston, Maine, $500; to the Androscoggin County Y. M. C. A., $200; and to the Maine Central Hospital at Lewiston, Maine, $2,500. These deductions were claimed as ordinary and necessary business expenses. An additional tax was assessed by the Commissioner of Internal Revenue covering the total amount of said contributions, to wit: $22,023.72, which additional tax was paid under protest. A claim for the refund of said amount was duly filed and was rejected. This action is for the recovery of same. In 1923 said Lunn & Sweet Company was reorganized under the name of Lunn & Sweet (Inc.), which latter corporation was reorganized in 1925, under the name of McLaughlin-Sweet (Inc.), and in January, 1927, it changed its corporate name to Alfred J. Sweet (Inc.), plaintiff in this suit.
It is provided by section 234 (a) of the revenue act of 1921, 42 Stat. 254, “That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:
“(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * *
*660 The same provision had been carried into the earlier acts.
It is plaintiff’s contention that the contributions in question fall within the meaning of the term “ ordinary and necessary expenses.”
It will be observed that under the act of 1921, as well as the act of .1918, Congress provided for deductions by individuals for contributions or gifts of the nature and character of the contributions made by plaintiff in this case. See section 214 (a) of the act of 1921, subparagraph 11, 42 Stat. 241, and section 214 (a) of the act of 1918, subparagraph 11, 40 Stat. 1068. However, Congress has never extended this deduction to corporations. On the contrary, it has expressly refused to do so. When the revenue act of 1918 was under consideration in the Lower House of Congress, an amendment was offered providing for the deduction by corporations of gifts or contributions similar to the rights granted to individuals. This amendment was the subject of active discussion on the floor of the House and on a vote was defeated. Congressional Record (House), volume 56, part 10, pages 10426-7-8; September 17, 1918. In the light of this specific action there can be no doubt as to the intention of Congress on the subject in controversy. In the case of Consolidated Gas, Electric Light & Power Company of Baltimore v. United States, decided in this court on April 2, 1928, 65 C. Cls. 252, involving the identical question presented in this case, the court, in an opinion by Chief Justice Campbell, said:
“ But it was not an ordinary expense nor was it a necessary one. The amount was what the corporation thought proper to subscribe, and whether to be subscribed at all, was a voluntary act.
“* * * It is sufficient for this case to say that Congress has authorized certain deductions and the court can not extend the terms they have employed. * *
Conceding that plaintiff company was benefited by the construction and maintenance of the institutions for which the contributions were made, it was merely an indirect benefit such as would be enjoyed by the general public in that community. However, praiseworthy the act of plaintiff com *661 pany in its contributions, Congress has not authorized their deduction from the gross income of corporations, but on the contrary has specifically declined to do so.
Taxing statutes may not be extended by implication beyond the clear import of the language used. Gould v. Gould, 245 U. S. 151; United States v. Merriam, 263 U. S. 179.
Plaintiff is not entitled to recover and the petition will be dismissed.
SiNNOtt, Judge; GREEN, Judge; Geaham, Judge; and Booth, Chfef Justice, concur.