**UNITED STATES of America, Plaintiff,**

v.

**MARIETTA MANUFACTURING COM-
PANY, Inc., and the Travelers Indemni-
ty Company, Inc., Defendants.**

Civ. A. No. 2173.

United States District Court
S. D. West Virginia,
Huntington Division.

May 18, 1967.

Milton J. Ferguson, U. S. Atty., George D. Beter, Asst. U. S. Atty., Huntington, W. Va., Bertram E. Snyder, Attorney, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for plaintiff the United States.

Robert H. C. Kay, Kay, Casto & Chaney, Charleston, W. Va., for defendant Marietta Manufacturing Co., Inc.

James K. Brown, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., Kahl K. Spriggs, Washington, D. C., for defendant the Travelers Indemnity Co., Inc.

CHRISTIE, District Judge:

This is an action by the United States to recover certain costs ($1,567,194.94) allegedly incurred as a result of defendant Marietta Manufacturing Company's default under contract No. MA–3156, calling for the construction of two ships for the Department of Commerce, Maritime Administration, for the performance of which defendant The Travelers Indemnity Company became surety and guarantor. The excess costs in question were necessitated by Marietta's alleged failure to timely perform and the reletting of the work to another concern. Plaintiff has presently moved the Court, pursuant to Rule 56(a), Federal Rules of Civil Procedure, 28 U.S.C.A. p. 302, for partial summary judgment on the question of liability. We deny the motion.

## FACTUAL BACKGROUND

On November 19, 1962, the Maritime Administration entered into a contract with Marietta for the construction of two hydrographic surveying ships, the consideration for which was $6,822,458.00. Pertinent contract provisions (Articles 29, 30 and 35) are found in the appendix. Delivery was to have been made by November 18, 1964 and March 18, 1965. By an addendum dated July 1, 1963, the delivery dates of the vessels were extended to February 18, 1965 and April 18, 1965.

On October 1, 1963, a strike occurred at Marietta's yard, lasting until February 8, 1964. After work resumed, progress was slow and on July 24, 1964, L. C. Hoffman, Chief, Office of Ship Construction (hereinafter referred to as Chief), advised Marietta by letter that the progress on two ships was unsatisfactory and requested Marietta to submit certain data within fourteen days following receipt of the letter. Under Article 5 of the contract, Marietta was entitled to extensions because of delays caused by strikes. At Marietta's request, certain extensions were granted, but not for the time requested.

On September 15, 1964, J. W. Glick, the then Acting Maritime Administrator, notified Marietta that, due to "inadequate working capital and reduction of labor force" and its lack of diligence, its progress on the contract was unsatisfactory, declared it to be in default and gave it fifteen days from the receipt of the no-

tice within which to remedy the situation. On the same day, however, the Chief advised Marietta that as a result of the strike they would be allowed an extension of 132 days for the delivery of each vessel. Marietta replied to the September 15, 1964 notice of default by telegram on October 2, 1964, stating that the conclusions therein were unjustified and requesting a minimum extension of 455 days to deliver each of the vessels.

By telegram on October 7, 1964, Nicholas Johnson, Maritime Administrator, requested Marietta to submit additional data in order that they might have all relevant information before proceeding under Articles 29 and 30 (the default clauses) of the contract. By letter dated October 30, 1964, Marietta declined to send the requested information because of the fact that the stated purpose of the October 7, 1964 telegram was to gather information to proceed under the contract's default clauses, and further, because the Maritime Administration had had a full-time representative at the yard and was aware of all "facts concerning the causes of delay in production."

On November 10, 1964, the Chief advised Marietta that 193 days of additional time for delivery of each vessel was being allowed because of the strike. Marietta had requested 455 days. The revised delivery dates were August 30, 1965 and October 28, 1965. The letter also notified Marietta that it had 30 days in which to appeal this determination; gave instructions for perfecting appeal and advised that the Administrator was the proper authority to hear it. Strange, however, before time for appeal had expired, the Chief, eight days later, on November 18, 1964, advised Marietta by letter that he had on that day determined (1) that it had not used diligence in the performance of the contract; (2) that its financial condition was such as to render it impossible for it to fulfill its obligations under the contract; and (3) that it had failed to employ sufficient manpower since settlement of the strike. The Chief concluded his letter by saying, "This is my final decision in this matter."

His letter also advised Marietta that it had 30 days under Article 35 of the General Provisions of the contract in which to appeal and that the Administrator was the authority to hear and determine the appeal. Notice of appeal was given by Marietta on December 7, 1964 with regard to the 193-day extension, and on December 16, 1964 with regard to the default. Article 35 provides that such appeals should be addressed to the Administrator and that the contractor shall be afforded an opportunity to be heard before the Administrator or his representative. However, notwithstanding the Chief's letters notifying Marietta that it had 30 days to appeal both determinations, and notwithstanding Marietta's clear right under Article 35 to present evidence and to be heard before the Administrator, the Administration, on November 18, 1964 (the same day the Chief had determined Marietta to be in default) advised Marietta by letter that,

"The Chief, Office of Ship Construction, Maritime Administration, under the provisions of Article 35 of the General Provisions of Contract No. MA–3156, has this day determined that certain events of default have occurred under the provisions of Contract No. MA–3156.

"On the basis of a review of this matter, I have determined that 'events of default' have occurred * * *.

"Accordingly, under the provisions of Article 30 of the General Provisions of Contract No. MA–3156, the Maritime Administration hereby terminates Contract No. MA–3156 by reason of such events of default."

Thus, it appears that Marietta was deprived of its rights under Article 35 of the contract to present evidence before, and to be heard by, the Administrator before he acted upon and gave approval to the Chief's decision that "events of default" had occurred.

Marietta, being aggrieved by this precipitous action by the Administrator, gave timely notice of appeal therefrom. The Chief, on December 29, 1964, advised

Marietta that the November 18 decision of the Administrator, purporting to have been a review of the Chief's decision of the same date, was a dispute within the meaning of Article 35 of the contract and as such, was subject to review by him (the Chief) and that it would be reviewed by him and a final decision issued on the matter. Thereafter, on January 26, 1965, the Chief upheld the November 18 decision of the Administrator and advised Marietta that it might appeal within 30 days to the Administrator. This circuitous and seemingly nonsensical procedure quite understandingly vexed and frustrated Marietta, and by letter of February 15, 1965, it gave vent to its feelings and intentions in this fashion:

"It was and is our position that Maritime Administration illegally and wrongfully terminated our contract and that its action in so doing constituted a breach of that contract. The position of the parties became fixed as a result of the action taken in the letter of Mr. Johnson dated November 18th, in conjunction with the actions of the Administration in making public announcement thereof and issuing the invitations to bidders. The determination of the merits of our respective positions will ultimately be for the courts.

"It now is evident to us that your letter of December 29th and your subsequent communications realized and recognized the wrongful termination of our contract and constitute efforts to undo the default which the Administrator declared on November 18th.

"The above recital, in view of the terms of the General Provisions of the contract, shows quite clearly that the appeals you mention, including those we took, and the appeal procedure attempted to be established are not only inadequate, but also futile and stultifying. The inversely reciprocal as well as the counter-clockwise or downward appeals procedures after the default action of the head of the Agency to those subordinate to him seem preposterous.

"No relief to our company is afforded by law or by contract through the medium of any appeal following the action of the Maritime Administrator in wrongfully terminating our contract and in issuing OSC–20.

"Accordingly, all appeals taken by us are both useless and moot."

However, notwithstanding Marietta's feelings and conclusions as thus expressed, hearings were thereafter held by the Administrator's representative on March 8 and 11, 1965 on Marietta's appeal from the Chief's November 11, 1964 decision allowing only 193 days additional delivery time and on its appeal from the Chief's decision of November 18, 1964 regarding the occurrence of "events of default," but it is noteworthy to observe that by the time these hearings were held the Maritime Administration had already relet the contract to another contractor, bids for the reletting having been issued December 3, 1964. Being aware of this, and already having been told by (a) the Chief that it was in default and that his decision was final, and by (b) the Administrator that he had reviewed and approved the Chief's determination of default, and, further, that the contract was terminated, Marietta quite understandingly felt that nothing could be done at these *post hoc* hearings to undo these findings and conclusions and restore the contract that had already been relet to another. Consequently, it did not attend or participate in them. And, as Marietta had surmised, a recommended decision was made on April 26 following affirming both decisions in all respects. This recommended decision became the final decision of the Administrator on September 28, 1965.

## ISSUES PRESENTED

Plaintiff takes the position that insofar as the motion for summary judgment on the question of liability is concerned, this Court is limited by the provisions of 41 U.S.C.A. §§ 321–322 (Wunderlich Act) [1]

---

1. Section 321:

"No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or

to receiving the administrative hearing record in Department of Commerce, Maritime Administration, Docket No. CA–15, and that if it is found therefrom that the determination of Marietta's default is supported by substantial evidence and not fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, then the motion should be granted as a matter of law. This is undoubtedly correct.

■■ However, among the defenses interposed by the defendants, is the one that the administrative procedures for the determination of default and termination set up in the contract were breached by the administrative agency rendering the Wunderlich Act inapplicable to the situation here presented. United States v. Utah Constr. & Mining Co., 384 U.S. 394, 412, 86 S.Ct. 1545, 16 L.Ed.2d 642. We agree, and shall confine our discussion to the effect of the Maritime Administrator's November 18, 1964 review of the Chief's November 18, 1964 determination of Marietta's default. This so-called review did not comport with the procedural requirements of Article 35 of the contract in that the reviewing officer (Administrator) failed to give Marietta a chance to be heard and to produce evidence before reaching his decision. It, therefore, cannot be used as the foundation for the fixing of liability against Marietta, unless there is a showing in the record that Marietta waived or otherwise gave up its right to be heard, and we find none.

The Supreme Court, in reflecting on the purpose of the Wunderlich Act, in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 428, 86 S.Ct. 1539, 1542, 16 L.Ed.2d 662, stated concerning the course a reviewing court should follow when the administrative record is defective:

"The policy reflected in this language, which requires utilization of the administrative procedures contractually bargained for, was clearly intended by Congress, * * * and it has been consistently reflected in a long line of decisions by this Court, * * * Pre-eminently, this policy is grounded on a respect for the parties' rights to contract and to provide for their own remedies. * * * But, beyond that, there is also a belief that resort to administrative procedures is an expeditious way to settle disputes, conducive to speed and economy. * * Further, reliance upon a few expert agencies to make the records and initially to pass on the merits of the claims properly presented to them will lead to greater uniformity in the important business of fairly interpreting government contracts."

The Court continued, p. 429, 86 S.Ct. p. 1543:

"It is true this Court has said on several occasions that the parties will not be required to exhaust the administrative procedure if it is shown by clear evidence that such procedure is 'inadequate or unavailing.' * * * It may be that the contracting officer, * * * or the Board of Contract Appeals, * * * so clearly reveals an unwillingness to act and comply with the administrative procedures in the contract that the contractor or supplier is justified in concluding that those procedures have thereby become 'unavailable.' Similarly, there may be occasions when the lack of authority of either the contracting officer or the administrative appeals board is so ap-

board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged; *Provided, however,* That any such decision shall be final and conclusive unless the same is fradulent (sic) or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence."

Section 322:

"No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board."

parent that the contractor or supplier may justifiably conclude that further administrative relief is 'unavailable.' But these circumstances are clearly the exceptions rather than the rule and the inadequacy or unavailability of administrative relief must clearly appear before a party is permitted to circumvent his own contractual agreement."

■ As before noted, the Administrator attempted to rectify his premature action of November 18, 1964, upholding the decision of the Chief of the same day, *without* notice to Marietta, by holding hearings on March 8 and 11, 1965, *with* notice to Marietta, but we believe Marietta was justified in not attending on the assumption that these post-default and post-termination hearings were designed as just another exercise in bureaucratic frustration and had as their real purpose to build a record *after*, rather than *before*, the fact, that would give favorable color and effect to the Administrator's abortive review of November 18, 1964, since its contract had already been terminated and relet to another contractor. Under such circumstances, we believe Marietta was justified in concluding, as it did, that no meaningful administrative relief was available to it and that it would be futile and useless to attend the hearings. Thus, the decision ultimately reached at these hearings can have little or no legal significance on the issue before us.

■■ It must be recognized that due process of law requires that there be a hearing at some time or stage in administrative proceedings, either before the agency or in the courts, before the determination can be made final and irrevocable or before it works a deprivation of life, liberty or property, except in exceptional circumstances involving the public interest, and that when particular procedures are set up, such as are found in the contract under consideration, the usual standards of fair play dictate that they be followed in the absence of extenuating circumstances. It is clear that this principle of law and the procedures set up by the parties in their contract were not adhered to by the Maritime Administration in this instance. Moreover, the Federal Procurement Regulations, 41 CFR 1–1.000 et seq., which "apply to all Federal Agencies to the extent specified in the Federal Property and Administrative Services Act of 1949, as amended, or in other law," provide procedures to be followed in case of default. Those pertinent here are:

41 CFR 1–8.000:

"(b) This part applies to contracts which initially or by amendment provide for termination for the convenience of the Government or for the default of the contractor, whether or not the clauses in the contract with respect to termination are those set forth in Subpart 1–8.7. However, to the extent that clauses actually used in contracts are inconsistent with the provisions of this part, the provisions of the clauses actually used shall control. \* \* \*"

41 CFR 1–8.603–3 provides:

"(c) If the contracting officer determines that termination for default is in the best interest of the Government, he shall promptly send a written notice to the contractor terminating his right to proceed. The notice shall:

\* \* \* \* \* \*

"(3) State that the contractor's right to proceed further with performance of the contract (or of a specified portion of the contract) is terminated;

\* \* \* \* \* \*

"(6) State that the notice constitutes a decision, pursuant to the Disputes Clause, that the contractor is in default as specified and that the contracting officer has determined that the delay is not excusable; and

"(7) State that the contractor has the right to appeal as specified in the Disputes clause. \* \* \*

\* \* \* \* \* \*

"(e) Promptly after issuance of the termination notice, the contracting of-

ficer shall determine the manner in which the work is to be completed and whether the materials, appliances, and plant which are on the site will be needed."

■ Article 35 of the instant contract appears to be susceptible to this procedure. In his November 18, 1964 letter reviewing the Chief's decision, the Maritime Administrator[2] makes specific reference to this clause. However, while the Chief's November 18, 1964 letter advises Marietta that they may appeal his determination of default to the Administrator, the Chief's letter of December 29, 1964 advised Marietta that he was the proper person to pass upon the Administrator's decision, which in turn was appealable back to the Administrator; a procedure that Marietta found to be "futile and stultifying" and which we find was neither in conformance with the appellate procedure of the contract nor a compliance with the Federal Procurement Regulations.

■■ In a March 19, 1965 letter the Chief attempted to explain this "procedure" on the ground that the authority to cancel a contract was retained by the Administrator rather than delegated to the Chief, Office of Ship Construction, and that upon the exercise of such authority and its being made the subject of a dispute under the disputes clause, the initial review of the Administrator's action lies with the Chief, Office of Ship Construction, as provided under Article 35 of the contract. We do not so read the Article. As we read it, the Administrator, who is the department head, makes the final decision after giving the contractor an opportunity to be heard. But if in fact the Chief's theory is correct, it is at odds with the recommended procedure found in the Federal Procurement Regulations. In such an involved system, wherein the department head makes a determination as to the correctness of a subordinate's decision, which in turn is reviewable by the subordinate with the review appealable to the department head, it is difficult to see how it in truth provides a contractor with any comprehensible method of effectively voicing disagreement with the department head's original action. But, be that as it may, any doubt as to the contract's proper interpretation must under rules of familiar construction be resolved against the party who prepared it—in this case the plaintiff—and we accordingly construe it to mean that the Administrator as head of the Maritime Administration is the reviewing authority rather than the Chief, Office of Ship Construction.

## CONCLUSION

It may not be amiss to note at this point that we are not presently concerned with whether or not there is sufficient evidence to support the determination that Marietta was in default within the meaning of the contract's provisions, but rather we are only concerned with ascertaining whether the administrative procedures were followed and complied with at the administrative level in such manner and to such extent as to require us to hold as a matter of law that liability on the issue of excess costs has been established. We are unable to make such finding on the basis of the administrative record before us at this stage of this litigation, even though we may entertain the belief that it may ultimately become necessary to direct a verdict upon the issue of liability at the conclusion of the evidence. Thus, we believe justice will be best served by denying the plaintiff's motion for partial summary judgment.

## APPENDIX

Article 29. EVENTS OF DEFAULT OF CONTRACTOR. The following shall constitute events of default under this contract:

(a) The failure of the Contractor to prosecute the contract work with such diligence and in such manner as will enable it to complete said work in accordance with the delivery date or

---

**2.** The Maritime Administrator is the head of the Maritime Administration. 5 U.S.

C.A. § 133z–15, note Reorg. Plan of 1961 No. 7.

dates set forth in the Special Provisions of this contract, except and to the extent that such failure is due to the causes stated in Article 5 of these General Provisions; provided, that the Administration shall have given the Contractor notice of such failure and that the Contractor shall not, within fifteen (15) days of the date of receipt of such notice, have shown to the satisfaction of the Administration that it has taken steps suffficient to remedy the failure in a manner satisfactory to the Administration.

(b) The failure of the Contractor in any other respect to use due diligence in the performance of the contract work or its failure to perform any of the covenants, agreements, or undertakings on its part to be performed hereunder, including but not limited to, its agreement to make prompt payment for all labor, material, services, and other charges which are to be paid by the Contractor under this contract; provided that the Administration, in either instance, shall give notice to the Contractor as to such failure, and the Contractor shall not, within fifteen (15) days after being so notified, correct any failure to use due diligence or undertake the performance of said covenants, undertakings, or agreements required to cure such failure, and thereafter prosecute in good faith to completion all such work or performance required to cure such failure.

(c) The Contractor being dissolved or adjudged a bankrupt or making a general assignment for the benefit of its creditors, or the appointment of a receiver or receivers of any kind whatsoever, whether or not appointed in bankruptcy, common law or equity proceedings, whether temporary or permanent, for the property of the Contractor, or the filing by the Contractor of a petition for reorganization or other proceedings with reference to the Contractor, under any of the provisions of the Bankruptcy Act, or the filing of such petition by creditors and approval thereof by the Court, whether proposed by a creditor, a stockholder or any other person whatsoever.

(d) The occurrence of any other event (except an event for which the Contractor would be entitled to an extension of time for completion under the provisions of Article 5 of these General Provisions) not contemplated by this contract which, in the opinion of the Administration, would make it impossible for the Contractor to carry out its obligations under this contract.

Article 30. ACTION BY ADMINISTRATION UPON DEFAULT.

(a) In the event that any one or more of the events of default specified in the preceding Article 29 shall have occurred, the Administration, if it so elects, may terminate this contract. The Administration may then, if it so elects, proceed to have the work on the Vessel completed and for such purposes may take possession and use and occupy so much of the Contractor's Shipyard, plant, equipment, tools, machinery, and appliances, as may be needed for such purposes, without the payment of any rental or other charge therefor to the Contractor, and the Contractor hereby agrees to assure to the Administration such use and occupancy of the said facilities and said other property of the Contractor for such period of time as may be necessary for the completion of the contract work.

(b) In the event of termination under this Article 30, and if the Administration shall elect to have the contract work completed, the Contractor shall (1) assign such subcontracts and orders for material, services, and supplies to be used in the performance of said contract work to the Administration as the Administration may direct, and (2) pay to the Administration the amount by which the total cost to the Administration of completing said work (including all amounts paid to the Contractor hereunder) exceeds the total Contract Price provided in this contract, as adjusted hereunder; pro-

vided, however, that in computing the amount, if any, to be paid by the Contractor to the Administration, appropriate adjustment shall be made for changes in the contract work subsequent to the termination of the contract.

(c) In the event of termination under this Article 30, and if the Administration shall not elect to complete the Vessel, the Administration may, at any time within one hundred and twenty (120) days from the date of termination hereunder, sell the partially completed Vessel, work-in-process, materials, articles of machinery, outfit and equipment, and supplies, together with all plans, specifications, calculations and other records required for the construction or equipment thereof. The sale shall be made free from any equity of redemption and without appraisement or valuation and shall be conducted in the manner determined by the Administration. Any purchaser at any such sale shall be given reasonable time, not less than sixty (60) days from the date of sale, within which to remove from the Contractor's plant the Vessel, work-in-process, materials, articles of machinery, outfit, equipment and supplies purchased. The Administration may become a purchaser at such a sale. The proceeds of the sale shall be applied, first, in payment of all costs and expenses, including reasonable attorney's fees incurred by the Administration or the Administration's assigns in making such sale; second, to reimburse the Administration for payments theretofore made by the Administration to the Contractor hereunder on account of the Vessel; third, to payment of any damages, demands, or deficiencies arising by reason of default of the Contractor; and fourth, the remaining proceeds, if any, shall be paid over to the Contractor. In the event the proceeds of the sale shall not be sufficient to pay the first, second, and third items, as above set forth, the difference shall be paid to the Administration by the Contractor or the Contractor's surety or sureties.

(d) The rights conferred upon the Administration under the terms of this Article 30 shall be in addition to, and not in substitution of, any rights which the Administration would have in either law or equity upon the happening of the events of default specified herein, or upon any failures on the part of the Contractor to perform the undertakings, agreements, and covenants on its part to be performed hereunder. The failure of the Administration to exercise the rights conferred upon it hereunder in any one or more instances of the occurrence of an event of default, as hereinbefore defined, shall not constitute a waiver of the right subsequent to terminate this contract, as herein provided.

Article 35. DISPUTES. Any action, omission, direction, decision or determination of the Administration or the Contractor under this contract may be the subject of a dispute. Any dispute arising under this contract which is not disposed of by agreement of the parties to this contract shall be decided by the Chief, Office of Ship Construction, of the Administration, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor, which decision shall be final and conclusive and shall bind all parties to this contract unless within thirty (30) days from the date of receipt of such copy the Contractor appeals from said decision by mailing or otherwise furnishing said Chief, Office of Ship Construction, a written appeal addressed to the Administrator. The decision of the Administrator on any question of fact, unless determined by a court of competent jurisdiction to have been fraudulent, capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence, shall be final and conclusive and shall bind all the parties to this contract. In connection with any appeal proceeding under this Article 35, the Contractor shall be afforded an opportunity to be

heard before the Administrator or before the duly authorized representative or representatives of the Administrator appointed for the hearing of said appeal and an opportunity to offer evidence in support of or in opposition to the appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract work and in accordance with the decision of said Chief, Office of Ship Construction.

Article 35 of the General Provisions is amended as follows:

Line 6—Between "Administration," and "who" insert "or by his duly authorized representative."

Line 6—Between "who" and "shall" insert ", as the case may be,".

Line 11—(Line 12 here) Between "Construction," and "a" insert "or his duly authorized representative, as the case may be,".

Line 24—(Line 27 here) After "Construction" insert ", or his duly authorized representative, as the case may be."