**S & E CONTRACTORS, INC.**

v.

**The UNITED STATES.**

**No. 104–67.**

United States Court of Claims.

Nov. 30, 1970.

---

Geoffrey Creyke, Jr., Washington, D. C., attorney of record for plaintiff; John P. Wiese, Hudson & Creyke, Washington, D. C., and Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant; Edward M. Jerum, and Vasil S. Vasiloff, Washington, D. C., General Accounting Office, of counsel.

Robert F. Keller, Asst. Comptroller General of the United States, filed a brief for the General Accounting Office as amicus curiae; Paul G. Dembling, General Counsel, General Accounting Office, and Vasil S. Vasiloff, attorney, General Accounting Office, Washington, D. C., on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON DEFENDANT'S REQUEST FOR REVIEW OF THE COMMISSIONER'S RECOMMENDED OPINION

NICHOLS, Judge.

This is a contract case before us on defendant's request for review of our

commissioner's recommended opinion. Stripped of subordinate and extraneous issues, the central question presented is whether the "Wunderlich" Act, 41 U.S.C. §§ 321, 322 (1964) (hereinafter referred to as the Act), affords the Government a right to obtain judicial review—coextensive with that of the contractor—of decisions of administrative tribunals unfavorable to it, on contract claims made in the course of the standard "disputes" procedure under the Wunderlich Act.

On August 4, 1961, plaintiff S & E Contractors, Inc. contracted with the Atomic Energy Commission (AEC) to build a testing facility at the National Reactor Test Station in Idaho. Performance of this contract generated numerous claims which the contractor properly filed with the contracting officer; those decided adversely to the contractor were seasonably appealed to the AEC. Since at this time the AEC did not have a contract appeals board to represent it, the contractor, under the AEC's then current procedures, was referred to a hearing examiner specially appointed to hear grievances and render findings of fact. Consequently, eight of plaintiff's claims were sustained by the hearing examiner and remanded to the contracting officer for negotiation and settlement on damage questions. Contrary to this directive, the contracting officer petitioned the AEC to review the hearing examiner's findings as to these eight claims. His petition was accepted and the AEC's review resulted in an affirmance of the hearing examiner's findings on seven of the eight claims. (The Government explains that the AEC did not actually affirm on these seven claims, but rather it merely declined to exercise its certiorari-like discretion to rehear them. This procedural clarification is of no real importance to our analysis, however, because the Government conceded at oral argument that the AEC's refusal to review these claims was itself sufficient to give the hearing examiner's findings administrative finality).

Again the matter was remanded to the contracting officer for final settlement.

This time, however, settlement discussions were interrupted and finally terminated by the intervention of the General Accounting Office (GAO). Our commissioner found that an AEC certifying officer requested advice from the GAO with regard to the certification of a voucher for the making of payment on one of the successful claims. No mention was made nor was any advice solicited concerning paying out on the remaining claims. Despite the narrowness of this request, the GAO advised the AEC in decision No. B–153841 (46 Comp.Gen. 441 (1966)) that payment on *any* of the disputed claims would be improper because the AEC's findings as to these claims were not supported by substantial evidence and were erroneous on matters of law. In view of this decision, the AEC informed plaintiff that plaintiff had "exhausted its administrative recourse to the Commission. * * * [and that] no action [would be taken by the Commission], in connection with the claims, inconsistent with the views expressed by the Comptroller General in * * * B–153841."

This information impelled plaintiff to bring suit in this court. Cross motions for summary judgment supported *only* by arguments and counter-arguments regarding the evidential substantiality and the legal correctness of the AEC's findings and conclusions were submitted to our trial commissioner. He, however, chose to disregard these arguments in favor of other theories. Essentially his opinion recommends that the AEC's failure to implement its own decision made under the contract's disputes provision (which he terms a repudiation) "must be regarded as a breach of that provision." Moreover, he suggests that the GAO intervention on substantiality and on legal grounds exceeded its authority and that therefore decision No. B–153481 "was too slender a reed * * * to support the Commission's repudiation of its own decision." The commissioner granted plaintiff's motion for summary judgment, and rather than have the parties go back to the AEC for findings on quan-

tum, he concluded that in view of the AEC's continuing refusal to pay plaintiff over a period of five years since its original decision, future relief there would be inadequate and unavailable. Hence, he recommends that plaintiff's damages be fixed by this court under a Rule 131(c) proceeding. The points are ably made and the arguments are substantial, but we disagree.

The pervasive question running through this controversy is whether the Government has a right at all to seek judicial review based on Wunderlich Act standards where a tribunal of its own creation issues a contract disputes decision favorable to the contractor. Should this question be answered affirmatively, we must also decide whether the Government's method of obtaining judicial relief in this case, simply by denying payment was proper.

Before tackling these provocative questions, we think it appropriate to define clearly the perimeters of our analysis. The factual background indicates that the Comptroller General effectively stopped payment of the claims. The Government, however, as represented by the Justice Department, which alone speaks for it in court, says that plaintiff would have been victorious by default in this court at the outset had Justice not decided to defend this suit. Specifically, it argues that this decision to defend was not prompted by any sort of requirement to give mandatory defense to opinions of the Comptroller General, but rather it was the uninfluenced product of the Justice Department's own thorough and independent review of the case. The Department considered the AEC's decision erroneous on matters of law and unsupported by substantial evidence in this case before us. Counsel for the Government therefore urges us to ignore the Comptroller's intervention as being the occasion but not the cause of the litigation and in no way itself an administrative decision having effect here or coming under our review.

■ We agree that the Comptroller's powers of decision and settlement, though great, may be assumed to lapse and fail at the Court House door. Therefore, it is not necessary for us to determine what decisions he might make or what finality they might have in cases not brought before us. When a Wunderlich Act case is pending here, the only question is how much finality attaches to the findings and holdings of the Board set up to execute the powers of the head of the agency in the premises. Really it makes no difference now whether the failure of defendant to pay out as the Board determined results, as here, from the Comptroller General's implied threat to charge the certifying officer's account, or from a change of heart in the agency itself, as was the case in C. J. Langenfelder & Son, Inc. v. United States, 169 Ct.Cl. 465, 341 F.2d 600 (1965). We hold that in either event, a refusal by defendant to pay a Board award is not a breach of the disputes clause if the involved award is not supported by substantial evidence or otherwise is not entitled to finality under the Wunderlich Act. The reasons for this view follow.

■ The focus of our inquiry is the Wunderlich Act; the exact wording of the contract disputes clause in question has no bearing, at least as applied to the case before us. As we said in an earlier case, "it is the Wunderlich Act which is determinative. The minimal bounds of judicial review must be drawn from the terms, history, and policy of that Act, not from policies speculatively drawn from the contract clauses which are themselves governed by the statute." C. J. Langenfelder & Son, Inc. v. United States, 169 Ct.Cl. at 477 n. 7, 341 F.2d at 607 n. 7 (1965).

Enacted in 1954 and unmodified thereafter, the Wunderlich Act reads as follows:

> § 321. *Limitation on pleading contract-provisions relating to finality; standards of review*
>
> No provision of *any* contract entered into by the United States, relating to the finality or conclusiveness of *any* decision of the head of *any* department

or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in *any* suit now filed or to be filed as limiting judicial review of *any* such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That *any* such decision shall be final and conclusive unless the same is fradulent (sic) or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence. (Emphasis supplied for word any).

### § 322. *Contract-provisions making decisions final on questions of law*

No Government contract shall contain a provision making final on a question of law the decision of *any* administrative official, representative, or board. (Emphasis supplied).

Strictly read the Act favors neither Government nor contractor: judicial review to whatever extent prescribed, seems extended equally and under like conditions to both contracting parties. The legislative history, albeit not explicitly, in general supports this construction. Both the House of Representatives and the Senate held full hearings on various bills introduced to undo the Supreme Court's decisions in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951); and United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256 (1950), making administrative disputes clause decisions final in the absence of fraud. (Hearings on H.R. 1839, S. 24, H.R. 3634 and H.R. 6946. Before Subcomm. No. 1 of the House Comm. on the Judiciary, 82d Cong. 1st and 2d Sess., ser. 12 (1953–54)), (hereinafter referred to as the House Hearings); Hearings on S. 2487 Before the Senate Subcomm. of the Comm. on the Judiciary, 82d Cong., 2d Sess. (1952), (hereinafter referred to as the Senate Hearings). Spokesmen representing public and private interests presented contrasting views on the proposed legislation and the compass of its judicial review privileges. A sampling of their statements follows:

And of course, the [Supreme Court's *Wunderlich*] rule works *both* ways. A deciding administrative official can make decisions adverse to the Government as well as to contractors, in which event an improper decision results in a burden, an improper burden, to the taxpayers * * *. The experience of the General Accounting Office has been that this is not an infrequent situation. * * *

\* \* \* \* \* \*

* * *. The enactment of such a [curative] bill would preclude administrative officers from making final decisions in contract matters on questions of law, but would leave such final decisions for determination by the General Accounting Office and the courts.

On the other hand, it would permit them to make determinations on questions of fact which would have final effect if the decisions were not found by the General Accounting Office or the courts to be fraudulent, arbitrary, capricious, et cetera. Such a law would not only protect a contractor from fraudulent, arbitrary or capricious action by giving him, in addition to resort to the courts, a further administrative remedy before the General Accounting Office, a time saving and less expensive proceeding, but it also would provide a protection, through the General Accounting Office, against decisions adverse to the interests of the United States. Certainly the rights of contractors and the Government to review or appeal should be *coextensive.*

\* \* \* \* \* \*

Now, we feel, * * * that this is a two-sided proposition. The interests of the contractors are clearly and undoubtedly involved. But likewise involved are the interests of the Government. I mean the *Government as a whole,* not just the Government as represented by one de-

partment or by one contracting officer.

Senate hearings, *supra*, at 9, 11, and 12, remarks of Frank L. Yates, Assistant Comptroller General of the United States. (Emphasis supplied).

\* \* \* \* \* \*

The position of the \* \* \* [Associated General Contractors of America] is: We believe that *any* decision made by a contracting officer or head of a department, agency, or bureau, should be subject to judicial review, in order to guarantee that such decision is reasonable, made with due regard to the rights of *both* the contracting parties, and supported by the evidence upon which such decision was based. (Senate Hearings, *supra*, at 29, remarks of John C. Hayes, counsel for the Associated General Contractors of America). (Emphasis supplied).

\* \* \* \* \* \*

The essence of the legislative proposal now before this committee is that the contractor is to be given three reviews, that is one before a contracting officer, a second before the head of the department concerned, and a third before the Court of Claims, while the Government has but one [before the contracting officer]. Senate Hearings, *supra*, at 16, remarks of Bonnell Phillips, attorney Department of Justice. (This criticism was directed at the original proposal, not the draft subsequently enacted into law).

Specific citations to further testimony on this subject are as follows: Senate Hearings at 83–84, remarks of Gardiner Johnson, attorney at law; House Hearings at 4, remarks of Elwyn L. Simmons, President, J. L. Simmons Co., Contractors; *Id.* at 12, statement of Harry D. Ruddiman representing certain contractors; *Id.* at 19–20, remarks and letter of Alan Johnstone, attorney; *Id.* at 32–34, statement of the Honorable Edwin E. Willis (Representative, Louisiana) sponsor of H.R. 6946; *Id.* at 38–39, remarks of E. L. Fisher, General Counsel, General Accounting Office; *Id.* at 48, remarks of U. Bonnell Phillips, Assistant to the As-

sistant Attorney General, Civil Division, Department of Justice; *Id.* at 59, remarks of J. H. Macomber, Jr., Associate General Counsel, General Services Administration; *Id.* at 109–11, remarks of Franklin M. Schultz; *Id.* at 140, letter of Lindsay C. Warren, Comptroller General of the United States; *Id.* at 138–139, letter of William P. Rogers, Deputy Attorney General of the United States; 99th Cong.Rec. 4573 (1953), remarks of Senator McCarran.

Plaintiff concedes that the recorded question and answer dialogue of the House and Senate Hearings "show Congressional awareness and intent that an administrative resolution of a contract dispute be amenable to review by both contracting parties", but it denies nevertheless "that the reviewing authority to be vested in the Government was to be anything other than the review function that had, in previous times, been exercised by the General Accounting Office." Simply, plaintiff's "basic position" is that "under the Wunderlich Act, Congress contemplated that the GAO *alone* would be vested with the *limited* authority [over cases of fraud and gross error] to speak for the Government in respect to matters involving contract payment decisions." (Emphasis supplied). Contrarily, the Government argues that the qualified brand of judicial review afforded by the Wunderlich Act was intended to be equally available to both Government and contractor.

Although it has been accurately observed that the Act's legislative history "has something for everyone" (Kipps, The Right of the Government to Have Judicial Review of a Board of Contract Appeals Decision Made Under the Disputes Clause, 2 Pub. Contract L.J. 286, 295 (1969)), we are convinced that Congress through the Hearings received a presentation emphasizing more the need for courts of competent jurisdiction to be open to both parties. The committee reports resulting from these Hearings reflect adoption of this position. The Senate Report accompanying S. 24 (S.Rep. No. 32, 83d Cong., 1st Sess. (1953)),

U.S.Code Cong. & Admin.News, p. 2191, which reflects the Wunderlich Act as passed, subject to modification to clarify the Comptroller General's status and other matters, makes the following observation:

It must also be borne in mind that to the same extent this decision [Wunderlich] would operate to the disadvantage of the *aggrieved contractor,* it would also operate to the disadvantage of the Government in those cases, as sometimes happens, when the contracting officer makes a decision detrimental to the *Government* interest in the claim.

\* \* \* \* \* \*

S. 24 will have the effect of permitting review in [the General Accounting Office] or a court with respect to *any* decision of a contracting officer or head of an agency which is found to be fraudulent, grossly erroneous, so mistaken as necessarily to imply bad faith, or not supported by [reliable, probative,] and substantial evidence. In other words, in those instances where a contracting officer has made a mistaken decision, either wittingly or unwittingly, it will not be necessary for the *aggrieved party* to, in effect, charge him with being a fraud or a cheat in order to effect collection of what is rightfully due. (Emphasis supplied.) [Bracketed language denotes corresponding language in S. 24 later deleted by preenactment amendment.]

Identical language to that quoted above can be found in Senate Report No. 1670, *supra.* Although the House Report (H.R. Rep.No.1380, 83d Cong., 2nd Sess. (1954)) did not include similar language, it did make this statement:

After extensive hearings it has been concluded that it is neither to the interests of the *Government* nor to the interests of any of the industry groups that are engaged in the performance of Government contracts to repose in Government officials such unbridled power of finally determining either disputed

questions of law or \* \* \* fact arising under Government contracts, nor is the situation presently created by the Wunderlich decision consonant with the tradition that *everyone* should have his day in court and that contracts should be mutually enforceable. \* \* \*. (Emphasis supplied).

■ Considering the plain language of the Act and the basic premises of equity surrounding its passage, we reaffirm our reasoning in *C. J. Langenfelder, supra,* and Acme Process Equipment Co. v. United States, 171 Ct.Cl. 251, 258–259, 347 F.2d 538, 543–544 (1965), and hold that the Government has the right to the same extent as the contractor to seek judicial review of an unfavorable administrative decision on a contract claim.

■ Our commissioner ruled and plaintiff now argues that the AEC's "repudiation" of its own decision was a breach of the disputes clause thereby entitling the plaintiff to *automatic* summary judgment on appeal. We have already rejected similar positions in *C. J. Langenfelder* and *Acme Process,* and for the reasons stated in those cases, plaintiff's assertion must likewise fail. We recognize that these two cases tacitly condoned the Government's withholding technique—exercised to the fullest here —as a way of forcing suit in this court and obtaining "at the very least" judicial review on questions of law. The instant case, however, not only involves questions of law, but also questions of fact and those elusive abominations known as mixed questions of law and fact.

We do not perceive this to be a distinction substantial enough to cause different results. Neither the Act nor its history will sustain foreclosing the Government from judicial review on this basis. Divided into two sections, the Act precludes the attachment of finality to any administrative decision rendered on a question of law or issued as a result of fraud, caprice or arbitrariness or so grossly erroneous as to imply bad faith, or not supported by substantial evidence. The same equity which permits us to relieve

the parties from legally erroneous decisions also dictates our intervention where factual determinations are fraught with any of the above deficiencies.

The Supreme Court's United States v. Utah Constr. Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), anticipates our conclusion with approval. There the contractor under the disputes procedure brought two claims against the contracting agency, the Atomic Energy Commission. The "Pier Drilling" claim asked for an equitable adjustment of the contract price and a time extension under the contract's changed conditions clause. The second claim—denominated as the "Shield Window" claim—sought additional compensation and time for inadequate specifications and drawings supplied by the Government. Both claims alleged that the additional compensation was needed to balance losses incurred by the contractor consequent to Government-caused delays. The AEC's Contract Appeals Board made findings generally unfavorable to the contractor thus prompting suit in this court. We found the contractor's claims for delay damages to be breach of contract claims and as such ineligible for administrative consideration under the disputes procedure. We held, with one dissent, that the Board's findings on these claims were not final and that it was appropriate for us to consider the factual circumstances *de novo*. The Supreme Court rejected this reasoning. The Court noticed that the Board's findings as to the causes of the contractor's delays were common to both the disputes claims for time extensions and the breach claims for damages. It held therefore that where a Board makes findings within the scope of its disputes authority, the presumed finality of these findings statutorily prescribed by the Wunderlich Act does not evaporate merely by changing the labels on the claims. Crucial to our case, however, is the concluding pronouncement made by the Court in Utah at 422, 86 S.Ct. at 1560:

> In the present case the Board was acting in a judicial capacity when it considered the Pier Drilling and Shield Window claims, the *factual* disputes resolved were clearly relevant to issues properly before it, and *both* parties had a full and fair opportunity to argue their version of the facts *and* an opportunity to seek court review of any adverse findings. * * *. (Emphasis supplied).

Hence the Court recognized the Government's right to judicial review of administrative factual determinations not meeting Wunderlich standards.

The trial commissioner's theory presupposes an identity between the Boards which adjudicate "Disputes Clause" cases and the directing heads of the agencies which make the contracts. When the Boards have spoken, the agencies have spoken, he thinks, and if they sustain the contractor, there is no dispute and nothing for the judicial power to operate on. It is true the differentiation is imperfect in the AEC procedure under review here, where the AEC itself is the final arbiter. But even so, the hearing examiner had no management functions. Under the Armed Services and GSA contracts, which generate the largest number of contract disputes, the Boards operate independently of the procurement authorities. The Armed Services Procurement Regulation establishes the Armed Services Board of Contract Appeals and authorizes it to decide appeals under the Disputes Clause of the contract, "as fully and finally as might each Secretary." 32 CFR § 30.1 (1962). The Federal Procurement Regulations contain similar provisions for the General Services Administration Board of Contract Appeals. 41 CFR § 5–60.101 (1963). The Secretary of Defense and the Administrator of GSA reserve to themselves no power of review or ratification of Board decisions. If one of them tried to tell a Board what to do in a pending case, he would commit a reprehensible *ex parte* approach. Camero v. United States, 179 Ct.Cl. 520, 375 F.2d 777 (1967).

We think the Wunderlich Act and the Supreme Court decisions interpreting it, in attributing finality to the extent they

do to decisions of these Boards, necessarily imply an expectation that the Boards, while in the nature of things not as independent as Article III courts, will enjoy a degree of independence approaching and comparable to that of the various independent quasi-judicial and regulatory boards and commissions which, too, can make binding fact findings. *E. g.* National Labor Relations Board, 29 U.S.C. § 153 (1947); Securities Exchange Commission, 15 U.S.C. § 78d (1934); Federal Communications Commission, 47 U.S.C. § 151 (1934); Civil Aeronautics Board, 49 U.S.C. § 1321 (1958); Interstate Commerce Commission, 49 U.S.C. § 11 (1935). Having achieved this, it would be inconsistent and unfair for the law to turn around and pretend that the Board and the Secretary were the same. The Supreme Court characterized a disputes clause as an agreement "for the settlement of disputes in an arbitral manner", in the *Wunderlich* case, *supra,* 342 U.S. at 100, 72 S.Ct. at 156. Appeals Boards of course, like the rest of us, sometimes err, but we see scant reason to believe they think of themselves as closer to one party than the other. To do so would demean the high standards they are sworn to as members of the bar. The Armed Services Board must consist of qualified attorneys admitted to the bar. 32 CFR § 30.1. The GSA Board includes at least three lawyers of whom each panel must include one or more. 41 CFR § 5–60.102. These requirements imply not only standards of education and training but also standards of ethics. From lawyer members, we believe, the public has a right to expect conformity to Canon 13 of the Canons of Judicial Ethics when they are acting in what the Supreme Court *quot supra,* calls a "judicial capacity." Canons 17, 24 and 29 also have special application to lawyer members of Contract Appeals Boards.

We think, in the existing circumstances, a Board power to extinguish a case or controversy merely by agreeing with the contractor is inconsistent with true independence. If, *e. g.,* the Secretary of Defense has established a Board that binds him as fully as he could bind himself, even as to legal conclusions and even in case of an arbitrary or capricious Board decision, he has created a Frankenstein monster. The temptation either to appoint persons to the Board who would be subservient to management wishes, or to make improper *ex parte* approaches, would be near to impossible to resist. Within the four walls of an executive establishment, the real independence of a Board would be suspect, the facts as to this would be difficult to come by, and contractors could never be sure they were getting from disputes would be final, while insistence on it mally not be reviewed by a court, and able line to the Government would nor- clause procedures what they had contracted for. On the other hand, if the Secretary has the right to seek review within Wunderlich Act limitations, there is a safety valve and Boards can call cases as they see them without so much pressure building up. It would seem therefore, that even an egomaniac Board member would not desire the powers it is asserted on his behalf he possesses. Most of us have enjoyed the blessed relief of saying: "If you don't like my decision, the courts are open!"

In the administration of revenue laws, the differentiation between administration and adjudication is often not spelled out. The result is the rule of selecting among possible interpretations of law, the one that appears likely to raise the most tax. This rule has a name, the "Protect the Revenue" principle, under which it is heresy to abandon an arguable nonfrivolous line of legal reasoning on the mere ground that another line, generating less revenue, appears to be right. Abandonment of the most favor- produces judicial review, and this is the controlling reason why the administrator-adjudicator is apt to prefer the latter. From these observed facts it seems clear that decisions of a truly impartial and independent tribunal should always be equally reviewable, for whomsoever it

decides. Breach of this principle is a prime cause of slanted decisions.

It is true, as we have already noted, that the AEC had not delegated its disputes clause powers to an independent Board. In this, however, the situation was somewhat unusual. We think we are justified in analyzing the position of the Congress and the Supreme Court in light of their knowledge that delegation to an independent Board was then common and doubtless would remain so. Since the Wunderlich Act, the head of an agency would appear to be acting in a judicial capacity when he reserves to himself the adjudication of a claim under disputes clause procedure. He has for the nonce set his managerial responsibilities aside and put on another hat. Otherwise he would not be entitled to claim Wunderlich Act finality for his decision against a contractor's attack. The employment, as in this case, of a hearing examiner facilitates this differentiation of roles, and makes it more than a sham. Despite the emphasis of one of our dissenters on the absence of an independent Board in this case to execute the powers here involved, no reason is offered why legal consequences should flow from the distinction, and it would appear there are none. If we held that the AEC's action obliterated the dispute, we would have to hold that the decision of a Board it created would do the same.

We are assured on behalf of defendant that the GAO has in the past but sparingly tripped up the implementation of a Board decision favorable to a contractor, by means of threatening to charge a certifying officer's account, or otherwise. We are asked to infer it will exercise like self-restraint in the future. If so, the effect of our decision will not be to encumber further the already deplorably slow and rocky road to the final adjudication of Government contract disputes under the Wunderlich Act. If not, this would be for the further attention of Congress rather than warranting us in frustrating its evident purpose as to the full mutual availability of judicial review under the statutory standards. As long as procedures remain as they are, there is need for special diligence on the part of all concerned to keep cases moving along and to avoid multiplication of needless technical maneuvers.

In view of the foregoing, we remand the case to the commissioner for his consideration and report on the various claims under Wunderlich Act standards.

SKELTON, Judge (dissenting):

This court should not consider nor act on the alleged "appeal" filed by the Attorney General in this case for the reasons set forth below.

*There is no Controversy Between the Plaintiff and the Atomic Energy Commission on the Facts or the Law in This Case*

It is elementary that a court will not consider a case unless there is a controversy between the parties on the facts or on the law, or both. No such controversy exists here. The contract was made between the plaintiff and the Atomic Energy Commission (AEC). They included the standard "disputes" clause in the agreement which established the procedure for presenting, considering, appealing, and settling claims and disputes. During the performance of the contract, disputes did occur and plaintiff presented the claims involved here to the contracting officer, who rejected them. The plaintiff duly appealed to the AEC, who referred the claims to an examiner. The examiner heard the evidence and handed down his decision. The contracting officer appealed from the examiner's decision to the AEC, who modified the examiner's decision and eventually issued its own decision and opinion. All of this was done in strict accordance with the disputes clause and the agreement of the parties. The plaintiff has accepted the decision of the AEC and is agreeable to the disposition of its claims in the manner set forth in such decision. Under these circumstances, one may logically ask the question, where is the controversy? Clearly there is none.

The only complaint the plaintiff has is the fact that it has not been paid and its claims have not been disposed of in accordance with the decision of the AEC to which it has agreed. In effect, the parties to the contract have settled their differences to the extent they are covered by the AEC decision.[1] In a sense, the situation of the parties here could be likened to that of litigants whose disagreements have become a stated account. Of course, this court has jurisdiction to entertain plaintiff's claim because it has not been paid as provided in the AEC decision.

On the other hand, the AEC has no claim, and, therefore, no right of appeal in this case. Actually, it has not asserted any claim nor any right of appeal here. As far as the record shows, it handed down a decision and was willing to carry it out and would have done so had it not been for the unjustified and completely unauthorized interference by the General Accounting Office (GAO), which will be discussed in more detail below, and the attempt by the Department of Justice to substitute its opinion for the decision of the AEC. In fact, were it not for the action of the GAO and the Department of Justice, the AEC would be willing to implement its decision at the present time, because there is nothing in the record that indicates it would not do so. As shown below, the Attorney General agrees that the AEC's decision has not been changed and the AEC would be willing to enforce it.

The AEC is the government as far as plaintiff's contract is concerned. It is the only party to the contract besides the plaintiff. The GAO did not sign the agreement and is not a party to this suit. The same is true with respect to the Department of Justice, who appears here only as the attorney for the AEC.[2] The AEC has no claim and asserts none.

*The AEC Has not Reversed, Modified, Cancelled, Set Aside, or Changed Its Decision in Any Way*

Another compelling reason why we should not consider the appeal filed by the Department of Justice is the fact that the AEC never at any time reversed, modified, cancelled, set aside, or changed its final decision between the time it was issued on May 13, 1964, and the date this suit was filed on April 11, 1967, or thereafter.

It will be noted that the concluding paragraph of the final order of the AEC of May 13, 1964, provided:

> The proceeding is remanded to the contracting officer with instructions to proceed to final settlement or decision in accordance with the decision of the hearing examiner dated June 26, 1963, as modified by our order of November 14, 1963, and by this decision.

United States Atomic Energy Commission
/s/ Glenn T. Seborg

Chairman Glenn T. Seborg
/s/ John G. Palfrey

Commissioner John G. Palfrey
/s/ James T. Ramey

Commissioner James T. Ramey
/s/ Gerald F. Tape

Commissioner Gerald F. Tape

/s/ W. B. McCool

W. B. McCool, Secretary[3]

This decision has never been reversed or changed in any way. The only act of the AEC after this decision was handed down was the writing of a letter dated March 27, 1967, by B. E. Hollingsworth,

---

1. The AEC decision, for the most part, determined the liability of the government to the plaintiff, leaving the amount plaintiff is to receive to be determined later by the contracting officer, subject to plaintiff's right to appeal as provided in the disputes clause.

2. This will be discussed more fully below.

3. Before the United States Atomic Energy Commission, In the matter of S. & E. Contractors, Inc. Under Contract No. AT (30-3) 790 Docket Nos. CA-161 and CA-162, Decision of May 13, 1964, pp. 14-15. For the sake of brevity, the complete decisions are not reproduced here.

General Manager of the AEC, to the attorneys for the plaintiff, which stated:

\* \* \* \* \* \*

The Atomic Energy Commission's view is that S&E Contractors, Inc. has exhausted its administrative recourse to the Commission. The Commission will take no action, in connection with the claims, inconsistent with the views expressed by the Comptroller General in his opinion of December 5, 1966—B-153841.

Sincerely yours,
B. E. Hollingsworth
*General Manager* [4]

This letter, although signed by the AEC's general manager, is not the official action of the AEC, but only the manager's opinion as to the view of the AEC. But even if it could be said to be the action of the AEC, it does not in any way reverse or modify the final decision of the AEC of May 13, 1964. It informs the plaintiff that it has exhausted its administrative recourse to the Commission. This is but another way of telling the plaintiff that the decision of the AEC is final and there is nothing more that plaintiff needs to do with the AEC. When the AEC said in the above letter that it would take no action in connection with the claims inconsistent with the GAO's opinion, it was simply saying that as far as it was concerned its decision of May 13, 1964, was final and it did not intend to do anything further with respect to it or the claims involved. Actually, it has not done anything further, and its decision of May 13, 1964, still stands.

As a matter of fact, the Attorney General has agreed that the AEC has not repudiated its decision and will promptly proceed to implement it if this court so orders. This is shown in Defendant's Request for Review of the Commissioner's Recommended Opinion filed herein on November 21, 1969, where the following statement appears:

\* \* \* *To our knowledge to date [November 21, 1969] the Commission [AEC] has not repudiated the decisions involved in this matter* and, in fact, plaintiff is relying on the purported finality of the decisions involved in this litigation. *Should the Court rule adversely to our assertions on the merits of the finality issues, then the Commission will promptly proceed to implement the decisions.* \* \* \* [*Id.* at n. 4.] [Emphasis supplied.]

This is an unqualified admission that the AEC decision has not been reversed or changed in any way, but is still in force. Under these circumstances, there is no claim of the AEC (the government) before the court in this case. A further admission by the Attorney General along this line is found on page 8 of Defendant's Reply to Plaintiff's Response to Defendant's Request for Review of the Commissioner's Recommended Opinion, where it is stated:

\* \* \* If we are not successful in establishing that the disputes *decisions* lack finality, obviously upon a final judicial ruling to that effect, *they would be promptly implemented.* [Emphasis supplied.]

*There is no Need to Reach the Question of Whether an Executive Agency can appeal from a Board's Adverse Decision, as There is no such Agency Appeal nor a Board's Decision In this Case*

The decision of the majority that an executive agency can appeal to this court from a Board's adverse decision is wide of the mark and must be considered as pure dicta, because there is no appeal by an agency from a Board's decision in this case.

The majority approaches the problem as if the AEC, an executive agency, was appealing from an adverse decision of an independent or quasi-independent Board. That is not the situation at all. In fact, no Board of any kind is involved. At the time this case arose, the AEC did not have a Board to hear appeals under the

---

4. Exhibit A, page 8, plaintiff's petition.

disputes clause. When the plaintiff appealed from the decision of the contracting officer, he appealed directly to the AEC. Since the AEC did not have an appeals board, it referred the appeal to a hearing examiner, who heard the case and rendered a decision on June 26, 1963. The contracting officer appealed to the AEC from this decision and the AEC modified it somewhat in its decision of November 14, 1963. The contracting officer was still not satisfied and asked for a rehearing. The AEC granted the rehearing and again modified the decision by its final decision of May 13, 1964. So, in this case, we do not have a board decision at all, but on the other hand we have not only one decision but two decisions of the AEC itself, both of which were rendered after the examiner had handed down his decision. Under these facts, it is erroneous to hold that there is an appeal by the AEC, the executive agency involved, from an adverse Board decision.

It is true that the majority opinion recognizes that the decision in this case was made by the AEC and not by a Board. But after acknowledging this fact, it is put aside and is ignored as far as the ultimate decision is concerned. Many pages of the opinion are devoted to a discussion of the independence, honesty and quasi-judicial character of administrative Boards, and why the "government" should be allowed to appeal from their adverse decisions (without saying who is the government or who in the government can appeal (through the Attorney General as attorney and spokesman)). The following excerpts from the opinion clearly indicate that it is based on the erroneous premise that the appeal in this case is by an executive agency from an adverse decision of a Board:

> * * * [T]he central question presented is whether the Wunderlich Act * * * affords the Government a right to obtain judicial review * * *

of decisions of *administrative tribunals* unfavorable to it * * *. [Emphasis supplied.]

The pervasive question running through this controversy is whether the Government has a right at all to seek judicial review based on Wunderlich Act standards where *a tribunal of its own creation* issues a contract disputes decision favorable to the contractor.[5] [Emphasis supplied.]

When a Wunderlich Act case is pending here, the only question is how much finality attaches to the findings and holdings of *the Board set up to execute the powers of the head of the agency in the premises.* [Emphasis supplied.]

Really it makes no difference now whether the failure of defendant to pay out *as the Board determined* * *. [Emphasis supplied.]

We hold that * * * a refusal by defendant to pay a *Board award* is not a breach of a dispute clause if * * *. [Emphasis supplied.]

The majority opinion then discusses Armed Services and GSA *Board* and their independence from review by the Secretary and Administrator, respectively (as if that were the situation here), saying:

> Under the Armed Services and GSA contracts * * * the *Boards* operate independently of the procurement authorities. * * *. The Secretary of Defense and the administrator of GSA reserve to themselves no power of review or ratification of *Board decisions.* [Emphasis supplied.]

We think the Wunderlich Act and the Supreme Court decisions interpreting it, in attributing finality to the extent they do to decisions of these *Boards, necessarily* imply an expectation that the *Boards* * * * will enjoy a degree of independence approaching and comparable to that of the various quasi-judicial boards and

---

5. I interpret the words "administrative tribunals" and "a tribunal of its own creation" to mean and refer to Boards and not to the executive agency itself.

commissions in the Executive Branch, *which, too, can make binding fact findings, e. g.,* National Labor Relations Board [etc.]. * * * *Having achieved this, it would be inconsistent and unfair for the law to turn around and pretend that the Board and the Secretary are the same.* [Emphasis supplied.]

We think, in the existing circumstances, a *Board* power to extinguish a case or controversy by agreeing with the contractor is inconsistent with true independence. If, *e. g.,* the Secretary of Defense has established a *Board* that binds him as fully as he could bind himself, even as to legal conclusions and even in case of an arbitrary or capricious *Board decision,* he has created a Frankenstein monster. * * Within the four walls of an executive establishment, *the real independence of a Board would be suspect * * *.* [Emphasis supplied.]

* * * On the other hand, *if the Secretary has the right to seek review* within Wunderlich Act limitations, there is a safety valve and *Boards* can call cases as they see them without so much pressure building up.[6] [Emphasis supplied.]

The real basis of the majority opinion is shown by the following statement:

From these observed facts it seems clear that decisions of a *truly impartial and independent tribunal* should always be equally reviewable, for whomsoever it decides. [Emphasis supplied.]

A reading of the above excerpts from the majority opinion makes it inescapably plain and clear that the opinion is based on the erroneous belief that in this case we have an appeal by an executive agency from an adverse decision of an independent tribunal or Board. These are just simply not the facts. It appears that the majority has attempted to decide a question that is not involved here.

The majority cites the cases of C. J. Langenfelder & Son, Inc. v. United States, 169 Ct.Cl. 465, 341 F.2d 600 (1965) and Acme Process Co. v. United States, 171 Ct.Cl. 251, 347 F.2d 538 (1965) in support of its decision. These cases are distinguishable on the facts and issues from the case before us. In the *Acme* case there was a Board decision, but there is none here. In *Langenfelder* the agency repudiated its decision and attempted to reopen the hearing in order to reverse it, which is not the case here.

Should it appear that those cases in any way conflict with the opinions herein expressed, to that extent I would overrule them.

The majority opinion is deficient in at least two vital respects, namely, (1) There is no appeal *by the AEC* (the concerned agency) from a Board decision nor from its own decision, and (2) There is no Board decision from which the AEC or any other agency could appeal.

The Attorney General has attempted to equate the decision of the AEC's hearing examiner to that of a Board. But this falls short of the mark. The agency's examiner and a Board are not the same. Their decisions are not the same. Furthermore, the AEC took the controversy out of the hands of its examiner and rendered two decisions itself thereafter. These are the decisions involved here.

*The Action of the GAO Was Unauthorized and Beyond the Scope of Its Authority*

The GAO has an auditing function and is without authority to overturn the decision of a contracting officer, a Board or an executive agency, in contract cases involving the standard disputes clause, in the absence of fraud or overreaching. See James Graham Mfg. Co. v. United States, 91 F.Supp. 715 (N.D.Cal.S.D. 1950). Our able Trial Commissioner, Mastin G. White, found that there was

6. No Secretary has sought review and there is no independent Board decision in our case.

no fraud or overreaching in this case. Therefore, when the GAO handed down a decision that plaintiff's claims were invalid and that the decision of the AEC favorable to the plaintiff on such claims was not supported by substantial evidence and was erroneous on matters of law, it purported to act as a reviewing court—a self-appointed court of claims —completely beyond its authority.

In addition to the foregoing, the action of the GAO on the claims involved in the case before us was completely unauthorized because such claims were never presented to it even for audit. The facts reveal that a certifying officer of the AEC asked the advice of the GAO with respect to the certification of a voucher in the sum of $32,297.73 payable to the plaintiff under the contract. This voucher consisted of three items, namely $22,280 withheld from plaintiff because it allegedly owed such amount to a supplier of aggregate, $8,366.19 withheld because of the government's possible liability to another contractor, and $1,651.-54 withheld because of a possible liability by the plaintiff to another contractor for telephone services. Our trial commissioner found that these amounts and this voucher did not include any proposed payment to the plaintiff on any of the seven claims that are under consideration in this case, namely, the "access", "concrete," "steam", "weather", "acceleration" and "backfill" claims. The Attorney General disputes this finding and says that at least one of the items in the voucher was related to delay damages for time extensions in the performance of the contract. The findings of the Commissioner are presumed to be correct, but even if he was mistaken in this respect, the action of the GAO was still unauthorized. It proceeded to review these seven claims in their entirety, the quantum of most of which had not (and has not) been determined, even though the claims had not been submitted to it for audit, and then issued an opinion regarding the invalidity of the AEC's entire decision, as aforesaid. It is clear that in taking this action, the GAO went out of its way to perform a review function which was not within its authority either by statute or by the terms of the contract.

The GAO now says by its amicus curiae brief filed herein that its action is not binding on the plaintiff and that its decision "did not, and could not, affect the ultimate substantive rights of the plaintiff" (Page 15), citing Iran National Airlines Corp. v. United States, 175 Ct.Cl. 504, 508, 360 F.2d 640 (1966) and St. Louis B. & M. Ry. v. United States, 268 U.S. 169, 174, 45 S.Ct. 472, 69 L.Ed. 472 (1925). This is of small consolation to the plaintiff after it has been "run over by the GAO steamroller" and forced into insolvency and out of business. His position is somewhat like that of an injured pedestrian who is told by a truck driver that he thought his truck had the right of way when it ran over him, and, anyway, he may recover from his injuries and he should just go away and forget it.

The Department of Justice takes more or less the same position saying that the action taken by the GAO is "irrelevant", is not in issue, and is not being relied on. It is obvious that the Attorney General would find it very difficult if not impossible to sustain the acts of the GAO as being within the scope of its authority and binding upon the plaintiff.

I would not belabor the GAO issue were it not for the fact that the majority opinion seems to give tacit approval to what the GAO did here by saying:

> We are assured on behalf of defendant that the GAO has in the past but sparingly tripped up the implementation of a Board decision favorable to a contractor by means of threatening to charge a certifying officer's account, or otherwise. We are asked to infer it will exercise like self-restraint in the future.

I am afraid that the majority is expressing a forlorn hope and is indulging in wishful thinking. This hope and thinking could turn to chagrin and dismay if the GAO, under the authority

of the majority decision in this case, makes a regular practice of overturning administrative decisions favorable to contractors as it did here. In that case, the Frankenstein mentioned by the majority in another part of its opinion will have been created by us. The result will be disastrous to contractors and very hurtful to the government as well. I do not think we should approve even by implication, what the GAO did here, but should flatly repudiate it.

*The AEC Is The Government In This Case, and The Attorney General Is Without Authority to Revise, Modify or Overturn Its Decision*

The Attorney General claims to be "the government" in this case. He says on page 6 of Defendant's Reply to Plaintiff's Response to Defendant's Request For Review of The Commissioner's Recommended Opinion:

> \* \* \* In this Court, the Government is, for all intents and purposes, the Department of Justice, 28 U.S.C. §§ 516, 519 (1966 Supp.).

In this statement, and otherwise, he implies that he and his Department have the power and authority to review a decision of another executive agency and to overrule it and substitute his own opinion for it on questions of fact and of law, of mixed fact and law, policy, discretion, expediency, exigency, propriety and executive agency judgment. I do not agree. Such reasoning would indeed make his department a super reviewing agency without whose approval no other executive agency or department could do anything with finality. He cites 28 U.S.C. §§ 516, 519 (1966 Supp.) and Federal Trade Commission v. Guignon, 390 F.2d 323 (8th Cir. 1968) in support of this proposition. A reading of these authorities does not support his theory. The two cited statutes merely provide that when the United States or an agency or officer thereof is involved in litigation, he shall be the attorney and counsel in a representative capacity to conduct the litigation. In other words, he is supposed to act as any attorney would

act in representing his client. These statutes in no way authorize him to review and overrule what another executive agency has already decided on matters peculiarly within its jurisdiction and substitute his own opinion and decision therefor.

The Federal Trade Commission case, *supra,* does not support the theory of the Attorney General. There the Federal Trade Commission sought to enforce subpoenas issued by it by using its own attorneys to make application in court for such enforcement. The Attorney General took the position that the Commission could not *represent* itself in court but must have the application for enforcement made by the Attorney General *"at the request of the Commission"*. The court upheld the contention of the Attorney General. It is clear that the issue there was whether the Commission could use its own lawyers or must use the Attorney General to make the application. This was a matter of who was to appear in court as the attorney for the Commission—a question of representation—not one of substituting the Attorney General's opinion or decision for that of the Commission on facts, policy or discretion, or any other matter within the jurisdiction of the Commission. It is significant, too, that the court indicated that the Attorney General should be requested by the Commission to represent it in court. (In our case there is no showing that the AEC ever requested the Attorney General to try to overturn its decision in this court, nor to modify it in any way.)

This court held in Campell v. United States, 19 Ct.Cl. 426, 429 (1884) that the authority of the Attorney General to conduct suits in the Court of Claims on behalf of the government "may fairly be held to include, at least, every act in the conduct of such suits, which an attorney at law, in a suit between individuals, might lawfully do." In other words, his position and authority is that of an attorney representing his client. We need go no further than the opinion of the Attorney General himself to sup-

port this proposition. He said in 7 Op. Att'y Gen. 577 (1855):

The relation of the Attorney General to any one of the Executive Departments * * * is that of counsel to client, namely, to give advice as to the legal right, and instruct procedure, *if desired,* leaving all considerations of administrative exigency or expediency to the decision of the proper Department. [Emphasis supplied.] [*Id.* at 577.]

The Attorney General himself has repeatedly ruled that he has no authority to review or overturn decisions of other executive agencies upon questions of fact, of mixed fact and law, policy, discretion, expediency or other matters peculiarly within the jurisdiction of such agencies. I quote only a few of these opinions as follows:

* * * It is not within the scope of my authority to reverse this decision of the [Civil Service] Commission or to require it to issue the certificate of reinstatement [of a discharged employee.]

No statute is found which authorizes the Attorney General to reverse or review this action of the Commission * * *. [20 Op. Att'y Gen. 270, 272 (1891).]

* * * The Attorney General has no control over the action of the head of the Department [Secretary of the Interior], nor could he with propriety express any judgment concerning the *disposition* of the matter * * * that being something wholly within the administrative sphere and direction of such head of Department. [17 Op. Att'y Gen. 332, 333 (1882).]

This substantially asks me to exercise appellate jurisdiction over a decision upon mixed questions of fact and law. This I am not empowered to do. [Directed to the Secretary of the Interior.] [20 Op. Att'y Gen. 711, 713 (1894).]

* * * I am not authorized to express any views upon a matter of propriety lying within your [Secretary of the Treasury] own executive judgment and discretion * * *. [25 Op. Att'y Gen. 93, 96 (1903).]

Finally, it is not within my province to construe the reasons affecting his administrative judgment and discretion, which might impel the head of a Department to take any action one way or the other in a matter pending before him for decision * * *. I am neither empowered nor required to pass upon the propriety of the exercise by the Secretary of the Interior of his official discretion. [25 Op. Att'y Gen. 524, 529 (1905).]

It appears * * * that I am not called upon to give an opinion upon a question of law now pending and undetermined in the Veteran's Administration but am asked to give an opinion upon a question which you have already considered and decided. It has been held by my predecessors that this Department possesses no jurisdiction under the law to revise a conclusion already reached * * *. (20 Op. Att'y Gen. 440). [38 Op. Att'y Gen. 149, 150 (1934).]

Mr. Bates says (10 Opin., 267): 'I have no power to investigate or decide on facts * * *.'

* * * I am not at Liberty to submit * * * an official opinion * * * upon the questions that have been decided * * *. [20 Op. Att'y Gen. 440, 444, 445 (1892).]

Not only must the question arise in the administration of a department, but it must be still pending and undecided. A matter which has been considered and decided by a department is not a 'question' upon which the Attorney General renders an opinion. (20 Op. 440). As Attorney General Butler (3 Op. 39) said, in declining to render an opinion upon a question which had been decided by the department making the request: 'I cannot undertake to give an official opinion on the question proposed to me, without assuming that this office possesses a revisory jurisdiction not conferred

upon it by law.' [39 Op. Att'y Gen. 67, 68 (1937).]

The last word of the Attorney General on this subject was expressed in his opinion of January 16, 1969, in which he said:

I understand the concern of GAO that its *review of contract appeals board decisions* is necessary to enable the Government to obtain judicial review of an adverse board decision. See 46 Comp.Gen. 441, 458 (1966). In my opinion, however, GAO review is not the only means to accomplish this purpose. *The contracting agency,* acting through the Department of Justice as the Government's counsel in claims litigation, *is also able to obtain such review on its own initiative.* \* \* \*

\* \* \* *The contracting agencies* should call to this Department's attention, on a continuing basis, *appeals board decisions,* against the Government which they feel warrant litigation in accordance with the Wunderlich Act. *Thereupon,* \* \* \* this Department, *as the attorneys* for the Government, will make an independent appraisal as to whether the suit can properly be litigated under the Wunderlich Act. \* \* \* [Emphasis supplied.] [42 Op. Att'y Gen. January 16 (1969) at 9, 10.]

\* \* \* \* \* \*

The broad executive responsibility for contract administration encompasses the separate functions of adjudication and advocacy. The contracting agency acts through its Board of Contract Appeals as *impartial arbiter of disputes.* Other organs of the agency represent the interests of the Government before the Board in the role of advocate. The advocacy aspect of the overall agency responsibility extends to determining *whether the agency* should seek review of an adverse *board* decision. [Emphasis supplied.] [42 Op. Att'y Gen. January 16 (1969) at n. 18.]

\* \* \* GAO audit can check on agency performance, but *only the contracting and legal officials of the agency have the intimate familiarity with these cases necessary for timely determination of those board decisions* in which judicial review to protect the interests of the Government is warranted. [Emphasis supplied.] [42 Op. Att'y Gen. January 16 (1969) at 11.]

Five principles stand out in the foregoing opinion. These are: (1) There must be a Board decision; (2) the Board must be an autonomous and "impartial arbiter of disputes;" (3) the Board's decision must be adverse to the interests of the government; (4) the contracting agency "on its own initiative" must seek judicial review of the Board decision; and (5) the Department of Justice acts as the attorney for the contracting agency. None of these requirements have been met in this case. Certainly, the opinion does not purport to approve an independent action by the Department of Justice on its own motion to judicially overturn the decision of an agency itself, which is the case here. Nor does it approve the proposition that an agency can appeal from its own decision. The opinion speaks only of an agency appeal from the ⸵decision of a *Board* that has acted as an "impartial arbiter" of a dispute.

In citing the 1969 opinion of the Attorney General above, I do not mean to imply that I agree with the statement therein contained that a contracting agency can obtain judicial review of an adverse Board decision. That question has not been expressly decided by this or any other court. It is not involved here. We should decide that problem when it is presented to us in a proper case.

The long-continued practice and custom of an executive agency in administering and performing its functions and duties and in interpreting applicable statutes, is entitled to great weight in determining its powers and authority. *See* United States v. Midwest Oil Co., 236 U.S. 459, 472–473, 35 S.Ct. 309, 59 L.Ed. 673 (1915); Udall v. Tallman, 380 U.S. 1, 17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315,

53 S.Ct. 350, 77 L.Ed. 796 (1933); Power Reactor Development Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Crawford v. United States, 179 Ct.Cl. 128, 142, 376 F.2d 266 (1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968). This rule is applicable here to determine the authority, or lack of it, of the Department of Justice.

It is clear from these statements of the Attorney General himself that he does not have any review or revisory power over decisions made by other agencies on matters peculiarly within their jurisdictions. He cannot substitute his own opinion for the decision of another agency, especially on questions of fact, mixed fact and law, policy, expediency, propriety, discretion, exigency or executive judgment. The above cited statutes did not enlarge his powers and authority in this regard.

The majority stresses the point that the Department's efforts here are "the uninfluenced product of the Justice Department's own thorough and independent *review* of the case." [Emphasis supplied.] It says further that "the Department considered the AEC's decision erroneous on matters of law and unsupported by substantial evidence * * *." I find no authority vested in the Department of Justice to *review* the AEC decision in any manner different from a review by any other lawyer of his client's case to familiarize himself with the issues involved in preparation for a court trial. Although not cited by the Attorney General, and apparently not relied on by him, a word should be said about Executive Order No. 6166 of June 10, 1933, issued by the President as authorized by Congress pertaining to the reorganization of executive agencies, in which broad powers were given to the Department of Justice to handle cases in court for governmental agencies.[7] Section 5 of the order provides in effect that such Department shall represent all government agencies and officers in all courts of the United States. It further provides that the function of decision whether and in what manner to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution or defense in any case referred to it to handle in court, *"now exercised by any agency or officer,* is transferred to the Department of Justice." I do not think this provision gave the Department the authority to review, revise, nullify, or reverse the administrative decision of another executive agency such as that before us, nor to substitute its opinion therefor. Actually, it did not give the Department any more authority in this regard than it already had. It will be noted that it was only given the function of decision *now exercised by any agency or officer.* At the time of the Order (1933) no agency had ever exercised any right of appeal to a court from an adverse decision of an administrative Board or from its own decision. As applied to our case, assuming the application of the Order as of the present time I have already shown that the question of whether an agency can appeal from an adverse decision of a Board is not before us and should not be decided. As to whether or not an agency can appeal from its own decision that is adverse to the government, my view is that it cannot do so. To allow such an appeal would be to sanction an absurd and ridiculous proceeding. In the first place, there is no necessity for it. If the agency thinks the government should win, it has the complete decision making power at the agency level. Such an appeal would be as ludicrous as an appeal by this court to the Supreme Court asking that one of our decisions be reversed. I cannot imagine an executive agency of the United States putting itself in such a foolish position. Since the agency is without power to engage in such an appeal, the Department of Justice is likewise without authority to do so by the very terms of the Executive Order.

7. Executive Order No. 6166 is reproduced in the footnote of Title 5, U.S.C.A., § 901 and also in Title 5, U.S.C. following omitted § 132, pp. 157–161 (1964 ed.).

Furthermore, the Department of Justice is given no decision making authority by the Order in a case until it is referred to the Department. Obviously such referral will not be made until the case is already filed in Court. Consequently, the words "or to appeal" refer to an appeal from the court decision and not to an administrative decision of the agency nor to a decision of a Board at the agency level. In short, the Order simply made the Attorney General the attorney for all agencies and officers of the government in cases in court and gave him the same powers to handle court cases that other attorneys have in similar circumstances in representing their clients. The Order did not empower the Attorney General to revise, modify or overturn an agency decision as he is attempting to do here. This is further shown by another paragraph of Section 5 of the Order as follows:

> Nothing in this section shall be construed to affect the function of any agency or officer with respect to cases at any stage prior to reference to the Department of Justice for prosecution or defense.

The procedure being followed by the Attorney General here not only affects the function of the agency at the agency level, but actually nullifies it. If the Attorney General is to have the last word in contract appeals cases and is to have a veto power over agency and Board decisions, we might as well do away with decisions of agencies and Boards altogether, and send all such appeals directly to the Attorney General for hearings and decisions, after appropriate contract changes.

I do not think Congress ever intended to confer upon the Attorney General the power he is asserting here when it passed the Wunderlich Act. His action, with the approval of the majority opinion, has tied the whole administrative process in contract cases into a very tight knot of red tape and delay, and it may take an Act of Congress to untie it, since this court has not seen fit to do so.

*A Day in Court for the Parties*

The Attorney General, in effect, urges that the parties here are entitled to their "day in court" on the finality issue and on the merits. At first blush, this is appealing to the American sense of justice and fair play. However, when it is applied to the facts and procedures in this case, it loses its appeal. The plaintiff does not want a hearing court. All he wants is the enforcement of the decision and to be relieved of inter-departmental squabbling over powers and duties. The AEC, the only other party to the suit, has had the questions involved in the case heard *four* times already by those authorized by the contract to hear them, namely, the contracting officer, the examiner and twice by the AEC itself, all of whom represented the government. The AEC has not asked for a court hearing on whether or not its decision is final nor on the merits, and, if it could speak out, it would no doubt oppose it. That only leaves the Attorney General, who is not a party and who appears in the case as an attorney. He wants a hearing in court to enable him to assert a theory contrary to the decision of his client, the AEC. His argument is unpersuasive.

The effect of the majority opinion is to allow the Attorney General *sua sponte* to appeal from the decision of another executive agency adverse to the government for the purpose of overturning it, and, by dicta, authorizes him to similarly appeal from an adverse Board decision for the same purpose. Such a procedure imposes an additional layer of bureaucratic red tape that contractors must overcome before they receive final decisions along the administrative trail on their claims under the disputes clause in government contracts. It easily adds from one to three years, and perhaps more, to the already extended period of time for processing a contractor's claim. Under such a system, how can a knowledgeable contractor afford to do business with the government?

*Quantum and Breach of Contract*

The trial commissioner held that the failure of the AEC to pay the plaintiff and carry out its decision for a period of over five years after it was rendered was a breach of contract. He also held that the administrative procedure was inadequate and unavailable and under the authority of United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), we should proceed to hold a trial on the quantum due plaintiff on his claims. Judge Collins also held in his dissent that there was a breach of contract by the AEC, citing United States v. Marietta Mfg. Co., 268 F.Supp. 176 (S.D.W.Va. 1967). While a breach of contract is strongly indicated, I feel that the AEC cannot be blamed for failure to pay the plaintiff because of the action of the GAO and especially because of its threat to charge any payment made to the certifying officer of the AEC. Therefore, I would not hold that the AEC breached the contract. Also, I feel that, although probably justified, the better policy would be not to hold the trial on quantum here but to remand the case to the AEC and its contracting officer for that purpose.

## CONCLUSION

I would deny the motion of the Attorney General for summary judgment, and grant plaintiff's motion for summary judgment, and remand the case to the AEC and its contracting officer for the purpose of enforcing and carrying out the final decision of the AEC.

COWEN, Chief Judge, concurs in the foregoing dissenting opinion of Judge SKELTON.

COLLINS, Judge (dissenting):

I concur in Judge Skelton's opinion except that I would hold that, in failing to pay its own award, the AEC breached its contract with S & E. Because of the broad impact of the court's opinion, however, I feel compelled to address myself to the issues as the court has framed them.

The court's decision in this case will, in one fell swoop, render the already troubled business of Government contracting hopelessly chaotic. I am convinced that today's decision is wholly undesirable and supportable only by a strained interpretation of legislative history.

The essence of the court's opinion is that the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1964), affords the Government the right to judicial review of decisions of its own agencies, rendered pursuant to the standard "disputes" clause in Government contracts, adverse to it. Support for this conclusion comes, according to the court, from the words of the act itself and from bits of legislative history which, in the court's words, "albeit not explicitly, in general supports * * * [the court's] construction." My own view of the act and its pre-enactment history leads me to the contrary conclusion.

Contrary to the court's opinion, I do not read the act as extending judicial review to both parties "equally and under like conditions." The clear and unambiguous language of the act reveals that, far from extending the right of judicial review to the Government, it merely serves to limit the contents and effect of the "disputes" clause, which has a history long antedating the act.

Furthermore, since a statute is merely the attempted verbalization of the legislative will, statutes must be read with one eye on the underlying legislative intent. In 1892, the Supreme Court, speaking through Mr. Justice Brewer, commented as follows:

> * * * It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers. This has been often asserted, and the reports are full of cases illustrating its application. This is not the substitution of the will of the judge for

that of the legislator, for frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

\* \* \*

\* \* \* "\* \* \* The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed."

\* \* \*

Church of the Holy Trinity v. United States, 143 U.S. 457, 459–460, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1896), *cited with approval in* Inter-City Truck Lines, Ltd. v. United States, 187 Ct.Cl. 290, 295, 408 F.2d 686, 688–689 (1969), Select Tire Salvage Co. v. United States, 181 Ct.Cl. 695, 703, 386 F.2d 1008, 1012 (1967). More recently, the Supreme Court has said that:

\* \* \* When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, *however clear the words may appear on "superficial examination."* \* \* \* *A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy,* "excepting as a different purpose is plainly shown." [Footnotes omitted, emphasis supplied.]

United States v. American Trucking Ass'ns, 310 U.S. 534, 543–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

For courts to interpret statutes in such a way as to extend, limit, modify, or alter in any way the manifest intent of the legislature amounts, in my view, to a clear usurpation of the legislative function. As I shall attempt to demonstrate, the act in question has but a single and limited purpose which does not at all support the court's conclusion in this case.

The Wunderlich Act (which, more appropriately, might be called the Anti-Wunderlich Act) was Congress' direct response to the Supreme Court's decision in United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951). In that case, reversing this court, the Supreme Court held that a decision of an agency head (or the contract appeals board to which he has delegated authority) under the "disputes" clause [1] could not be overturned on judicial review "unless it was founded on fraud, alleged and proved." 342 U.S. at 100, 72 S.Ct. at 156. The devastating effect of the *Wunderlich* decision was well described by Justice Douglas when he said, in dissent, that "[i]t makes a tyrant out of every contracting officer." 342 U.S. at 101, 72 S.Ct. at 156.

The evil perceived by Justice Douglas and the other dissenters did not escape congressional attention, and several bills were introduced, in both houses, to remedy the evil. Each house held its own hearings on the matter. The Senate hearings, from which testimony is quoted by the court were held in 1952. Witnesses at these hearings, representing both Government and industry, were understandably alarmed by the degree of finality which the Supreme Court's decision had accorded administrative decisions under the "disputes" clause.

The flavor of the witnesses' testimony regarding appeal from such decisions is, in many cases, ambiguous and, in no

---

1. The usual pre-Wunderlich Act "disputes" clause was as follows:

"ARTICLE 15. *Disputes.*—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

event, can be viewed as an endorsement of the position that the Government should be able to disavow and seek judicial review of adverse board decisions. On the contrary, if there is a discernible flavor to the Senate hearings, it is that only the contractor should have the benefit of judicial review.

For example, the testimony of Frank L. Yates, Assistant Comptroller General of the United States, quoted by the court, is to the effect that "the rights of contractors and the Government to review or appeal should be coextensive." Hearings on S. 2487 Before the Senate Sub-Comm. of the Comm. on the Judiciary, 82d Cong., 2d Sess. 11 (1952). At the same time, however, Mr. Yates testified as follows:

> * * * Such a law [a modified version of S. 2487 offered by the GAO] not only would protect a contractor from fraudulent, arbitrary or capricious action by giving him, *in addition to resort to the courts,* a further administrative remedy before the General Accounting Office, a time saving and less expensive proceeding, but it would also provide a protection, through the General Accounting Office, against decisions adverse to the interests of the United States. * * * [Emphasis supplied.]

*Id.* The witness' careful reference to the right which each party would have to review by the GAO and his obvious failure to refer to a concomitant right on the part of the Government to have "resort to the courts" can only indicate that, in urging "coextensive" rights of review for both parties, Mr. Yates was referring to GAO, not judicial, review.

The court also quotes from the testimony of John C. Hayes, counsel for the Associated General Contractors of America, Inc. At one point Mr. Hayes stated, as the court quotes, that the position of his organization was that:

> * * * any decision made by a contracting officer or head of a department, agency, or bureau, should be subject to judicial review, in order to guarantee that such decision is rea-

sonable, made with due regard to the rights of both the contracting parties, and supported by the evidence upon which such decision was based.

*Id.* at 29. The court fails, however, to quote later testimony of this witness which adds a vital gloss to the quoted testimony:

> In concluding, we respectfully urge that this committee draft legislation that will grant the United States Court of Claims, and the United States district courts to the extent that they now exercise jurisdiction concurrent with the United States Court of Claims, jurisdiction to hear, determine, *and enter judgment against the United States on any claim in which the contractor shall seek a review of a decision on a disputed question between the United States and such contractor, made by an officer, board, or other representative of the United States under any contract entered into with the United States.* [Emphasis supplied.]

*Id.* at 30. Clearly, looking at his testimony in its entirety, Mr. Hayes was of the opinion that the Government's rights in contract disputes were adequately protected by the "disputes" clause, which reposes decision-making authority in the Government agencies, and that judicial review was needed only to protect the rights of contractors.

The House Committee report accompanying the final draft of the act as passed in 1954 states, unequivocally, that the purpose of the act—the only purpose—was "to overcome the effect of the Supreme Court decision in the case of United States v. Wunderlich (342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113), rendered on November 26, 1951, under which the decisions of Government officers rendered pursuant to the standard disputes clauses in Government contracts are held to be final absent fraud on the part of such Government officers." H.R. Rep. No. 1380, 83d Cong., 2d Sess. 17 (1954). Thus, the express legislative purpose underlying the act was to do no more than reopen the channels of ju-

dicial review of decisions of Government officials pursuant to the "disputes" clause to the extent they had been open prior to the *Wunderlich* decision. Prior to *Wunderlich,* the Government could obtain such review of board decisions adverse to it only in those rare situations when, for fraud or other such compelling reasons, the General Accounting Office could and did set aside a "disputes" clause decision in favor of a contractor.

Perhaps the strongest support for my conclusion that the Wunderlich Act was not intended to provide the Government with the right of judicial review of adverse board decisions lies in the fact that Congress explicitly refrained from granting the GAO any greater power under the act than it already possessed. The House hearings reflected more than passing concern with that portion of a House bill [2] and the Senate bill, which gave the GAO, along with the courts, the power to review "disputes" clause decisions. The position of many of the opponents of this provision was well stated in a letter to the Chairman of the House Committee on the Judiciary from Mr. Roger Kent, general counsel of the Department of Defense:

> To superimpose General Accounting Office review on existing disputes clause procedures would not only create a completely new review, it would, as a practical matter, eliminate the usefulness of the disputes clauses themselves by destroying the concept of

finality and dividing the responsibility for determining the merits of any given appeal. Undoubtedly, this would generate protracted and expensive disagreements among Government agencies, the General Accounting Office and contractors representatives. This would defeat the aims of both the Government and its contractors by making it impossible to accomplish the very purposes of the disputes clause; i. e., the achievement of proper and expeditious performance of contracts.

Hearings on H.R. 1839, S. 24, H.R. 3634, and H.R. 6946 Before Subcomm. No. 1 of the House Comm. on the Judiciary, 82d Cong., 1st and 2d Sess., ser. 12, at 132 (1953–54).

In the end, the opponents prevailed and the objectionable provision was dropped. More importantly, however, the report accompanying the bill in its final form was careful to explain that the bill would not alter in any way the jurisdiction of the GAO:

> The proposed legislation, as amended, will not add to, narrow, restrict, or change in any way the present jurisdiction of the General Accounting Office either in the course of a settlement or upon audit, and the language used is not intended either to change the jurisdiction of the General Accounting Office or to grant any new jurisdiction, but simply to recognize the jurisdiction which the General Accounting Office already has.[3]

2. One of the bills under consideration, sponsored by the GAO, was H.R. 1839, 83d Cong., 1st Sess. (1953) :

"  *   *   *  That no provision of any contract entered into by the United States, relating to the finality or conclusiveness, in a dispute involving a question arising under such contract, of any decision of an administrative official, representative, or board, shall be pleaded as limiting judicial review of any such decision to cases in which fraud by such official, representative, or board is alleged; and any such provision shall be void with respect to any such decision which *the General Accounting Office* or a court, having jurisdiction, finds fraudulent, grossly erroneous, so

mistaken as necessarily to imply bad faith, or not supported by reliable, probative, and substantial evidence. [Emphasis supplied.]

"Sec. 2. No Government contract shall contain a provision making final on a question of law the decision of an administrative official, representative, or board."

3. The report also states: "It is intended that the General Accounting Office, *as was its practice,* in reviewing a contract and change orders for the purpose of payment, shall apply the standards of review that are granted to the courts under this bill." [Emphasis supplied.] H.R. Rep. No. 1380, 83d Cong., 2d Sess. 23 (1954). As will be shown, however, this unfortu-

H.R.Rep. No. 1380, 83d Cong., 2d Sess. 23 (1954). What, then, was the jurisdiction of the GAO before the adoption of the Wunderlich Act?

The Budget and Accounting Act of 1921, 31 U.S.C. §§ 71–134 (1964), conferred upon the GAO basic audit and settlement authority.[4] As early as 1922, however, the Supreme Court made it perfectly clear that the GAO had "no power" to upset the decision of a contracting officer where the authority to render that decision had been given to the contracting officer by the terms of the contract. United States v. Mason & Hanger Co., 260 U.S. 323, 43 S.Ct. 128, 67 L.Ed. 286 (1922). Perhaps the most quoted language relating to the powers of the GAO in these matters is found in the district court's opinion in James Graham Mfg. Co. v. United States, 91 F.Supp. 715 (N.D.Cal.1950):

> The powers of the Comptroller General are extensive and broad. But he does not, *absent fraud or overreaching*, have authority to determine the propriety of contract payments when the contracts themselves vest the final power of determination in the contracting executive department. * *
> [Footnote omitted, emphasis supplied.]

*Id.* at 716.[5]

Decisions of this court prior to passage of the act, likewise, leave no room for doubt that, except in cases where fraud or overreaching was involved, this court viewed as wholly without legal effect the action of the GAO in overturning a decision by a Government officer authorized by the contracting parties to be the deciding authority on disputes arising under the contract. *See, e. g.,* Bell Aircraft Corp. v. United States, 120 Ct.Cl. 398, 100 F.Supp. 661 (1951), aff'd, 344 U.S. 860, 73 S.Ct. 102, 97 L.Ed. 668 (1952); McShain Co. v. United States, 83 Ct.Cl. 405 (1936); Maryland Dredging & Contracting Co. v. United States, 66 Ct.Cl. 627 (1929).

It thus becomes apparent that if the legislative intent underlying the Wunderlich Act is to be given proper effect, the jurisdiction of the GAO to overturn board decisions under the "disputes" clause must be restricted to those instances where such decisions are produced through fraud or overreaching. In this case, our commissioner found that "the record is wholly devoid of any indication that the administrative decisions favorable to the plaintiff were tainted by fraud or overreaching." In Climatic Rainwear Co. v. United States, 115 Ct.Cl. 520, 88 F.Supp. 415 (1950), this court

nate statement resulted from a misunderstanding of the former practice of the GAO in reviewing board awards. "While the legislative history contains some conflicting statements, on balance it does indicate that Congress did not intend to set GAO up as an additional layer of administrative appeal for contractors on disputes clause questions." 42 Op.Atty. Gen. 33 (1969).

4. The relevant provisions of the act are as follows:

"All claims and demands whatever by the Government of the United States or against it, and all accounts whatever in which the Government of the United States is concerned, either as debtor or creditor, shall be settled and adjusted in the General Accounting Office." [31 U.S.C. § 71 (1964).]

"Disbursing officers, or the head of any executive department, or other establishment not under any of the executive departments, may apply for and the Comp-

troller General shall render his decision upon any question involving a payment to be made by them or under them, which decision, when rendered, shall govern the General Accounting Office in passing upon the account containing said disbursement." [31 U.S.C. § 74 (1964).]

"The liability of certifying officers or employees shall be enforced in the same manner and to the same extent as now provided by law with respect to enforcement of the liability of disbursing and other accountable officers; and they shall have the right to apply for and obtain a decision by the Comptroller General on any question of law involved in a payment on any vouchers presented to them for certification." [31 U.S.C. § 82d (1964).]

5. *See also* Leeds & Northrop Co. v. United States, 101 F.Supp. 999 (E.D.Pa.1951); Consolidated Vultee Aircraft Corp. v. United States, 97 F.Supp. 948 (D.Del. 1951).

held that, where the parties to a Government contract agree that a designated Government official is to determine factual disputes between the parties, "[t]he discharging of these functions could neither be delegated to nor usurped by anyone not authorized by the terms of the contract." *Id.* at 559, 88 F.Supp. at 421. *See also* New York Shipbuilding Corp. v. United States, 180 Ct.Cl. 446, 385 F.2d 427 (1967). While it is not clear, in this case, whether the AEC "delegated" authority to the GAO or the GAO "usurped" the AEC's authority under the "disputes" clause, it is clear that one of those two events must have occurred. For the foregoing reasons, I can only conclude, as did our commissioner in his excellent and well-reasoned report, that the GAO acted without authority in advising the AEC that none of the disputed claims was supported by substantial evidence, that all were erroneous on matters of law, and that payment on any of them would be improper.

In the present case, this court, by an act of judicial legislation, is doing what Congress specifically refused to do legislatively, *i. e.*, the court is effectively conferring upon the GAO authority to review final administrative decisions under the "disputes" clause of Government contracts for the purpose of ascertaining whether such decisions are supported by substantial evidence and otherwise meet the criteria set out in the Wunderlich Act. Moreover, the court is conferring such authority without imposing upon the GAO any collateral requirement that it grant procedural due process to con-

tractors in exercising the power of review. This is both unfair and exceedingly disadvantageous to persons who enter into contracts with the Government.

This brings me to a consideration of the court's holding that a refusal by the Government to pay a board award is not a breach of the "disputes" clause, *even though the refusal results "from a change of heart in the agency itself,"* if the involved award is not entitled to finality under the Wunderlich Act.[6] [Emphasis supplied.] To hold to the contrary, the court reasons, would violate the terms of the act.

As I have pointed out previously, the act had, and has, a very limited purpose —to overcome the effect of the *Wunderlich* decision. Since, at the time that decision was rendered, it would have been unprecedented for an agency to repudiate, or to seek judicial confirmation of, its own decision, I find it difficult to believe that Congress ever intended to confer this right which would vastly change the disputes procedure. Congress' intent, express and implied, was to return to the disputes process as it had existed before *Wunderlich*, not to introduce radically different, new elements into that process.

A brief look at the realities of the disputes procedure reveals that Congress could never have intended that the act be read as the court reads it. When a dispute arises between a contractor and the Government, the "disputes" clause sets out clearly the procedure to be followed.[7] First, the parties may volun-

6. It should be noted that, in this case, the AEC never had a "change of heart." The agency never reversed its determination of plaintiff's claims; its refusal to pay was based solely on the implied threat of the Comptroller General.

7. The "disputes" clause which was included in the contract between plaintiff and defendant is as follows:
"(a) * * * [A]ny dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to

writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Commission. The decision of the Commission * * * shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. * * *

tarily settle the dispute. If they do, that is the end of the matter. If no settlement is reached, the disputed matters are decided by the agency's contracting officer. If the contractor does not appeal to the agency from the contracting officer's decision within the prescribed time, that, again, is the end of the matter. If, however, the contractor does appeal to the agency, then, according to the court, a decision rendered by the agency or its board [8] favorable to the contractor is not the end of the matter; the agency is free at any time to disavow or repudiate its own decision, thereby forcing the contractor to sue. The anomaly created by the court's decision is too obvious to need elaboration. While an agency will still be bound by the decisions of its contracting officers, it will not be bound by decisions made at the highest level.[9]

The suggestion that the Government, after deciding a contract dispute with one of its contractors in favor of the contractor, can then promptly disavow that decision carries with it an enormous potential for mischief. It means that the Government, after deciding that its contractor's claim is meritorious, based on a *preponderance* of the evidence presented to it, can then turn around and reject the claim because there is *substantial* evidence (*i. e.*, less than a preponderance) to support the opposite result. The majority opinion puts a tremendous economic burden on Government contractors who are now faced with the prospect of prolonged judicial proceedings in order to collect funds to which the agencies have already found them entitled. After today's decision the Government would be foolish to pay *any* board awards.

Moreover, the court's decision will utterly defeat the purpose and utility of the "disputes" clause, which has served admirably over the years, and will seriously hamper the Government in virtually all its activities whenever it is forced to call on the resources of private firms. The purpose of the clause has been to promote the expeditious performance of Government contracts. By destroying the finality of board decisions favorable to contractors, the court has assured that the performance of Government contracts will be anything but expeditious. Protracted and expensive litigation has never been known for its beneficial effect on contract performance.

It should also be noted that contract prices in the future can only be expected to rise substantially due to increased contingency costs. The court's decision effectively removes any incentive which agencies, undeterred by the costs of

"(b) This 'Disputes' clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above; Provided, that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law."

8. The following provision of the Armed Services Procurement Regulations is instructive both as to the relationship between the agencies and their boards of contract appeals and as to the expectations of the parties when entering into a contract containing a "disputes" clause:
"* * * Decisions of the Armed Services Board of Contract Appeals constitute decisions of the Head of the Department as referenced in the Disputes clause standard in all Government contracts. *It is expected that decisions favorable to the appellant in whole or in part will be promptly implemented by payment at the*

*contracting officer level.* * * * " [Emphasis supplied. 32 C.F.R. § 1.314(g) (1970).]
The prompt payment of a claim by a contracting agency which has found it valid is the principal consideration for the unusual obligation of a Government contractor to proceed with the work while his claim is being considered.

9. In Maitland Bros., ASBCA No. 6607, 66–1 BCA ¶ 5416, the Armed Services Board of Contract Appeals held that the unappealed decision of a contracting officer, under a disputes clause, becomes final and conclusive on both parties, "thereby creating vested rights in such decision." *Id.* at 25,430. If a contracting officer's decision can create vested rights in a contractor, it seems illogical to conclude, as does the court, that the decision of the agency, made at the highest level, cannot create such rights.

litigation, might have to implement board decisions by payment. Indeed, the decision gives the agencies negative incentive. We would be foolish to think that contractors will overlook, in preparing bids, the vast potential for economic coercion which today's decision places in the hands of the Government and the many locations within the bureaucracy where this potential will lie. Furthermore, this rise in contract prices will undoubtedly far exceed whatever the Government might save in those rare instances when this court or another would overturn an agency decision in favor of a contractor.

Refusing to permit agencies to disavow their own decisions would by no means make the Government easy prey for the ill founded claims of contractors. In the first place, the "disputes" clause itself puts the power of decision making in the hands of the Government. It would not be speculative to assume that, if the boards established by the Government for this purpose err, they err in favor of the Government. As Justice Jackson said, dissenting in *Wunderlich*, "[m]en are more often bribed by their loyalties and ambitions than by money." 342 U.S. at 103, 72 S.Ct. at 157. Secondly, the GAO still has the authority to review board decisions for fraud or over-reaching.

The statements in C. J. Langenfelder & Son v. United States, 169 Ct.Cl. 465, 341 F.2d 600 (1965), and Acme Process Co. v. United States, 171 Ct.Cl. 251, 347 F.2d 538 (1965), upon which the court relies for substantiation of its position, to the extent they are inconsistent with the views expressed herein, should be recognized for their unwisdom and over-ruled.

In conclusion, I would hold that the Wunderlich Act does not, and was never intended by Congress to, invest the fed-

eral agencies or their counsel with authority to challenge the decisions which the agencies themselves have made pursuant to a contractual provision, and that a failure by such an agency to pay an award arrived at pursuant to a "disputes" clause results in a breach of that clause.[10] If the disputes procedures, which contractors must accept if they are to obtain Government contracts, are to serve the purpose of expediting the performance of contracts, it is absolutely essential that decisions adverse to the Government rendered by boards of its own creation be imbued with finality. Certainly the Wunderlich Act was never designed to bring about the chaos which I fear will be the result of the court's decision.

---

10. *See* United States v. Marietta Mfg. Co., 268 F.Supp. 176 (S.D.W.Va.1967). In that case the court held that the Government's failure to follow the disputes procedures, as found in its Federal Procurement Regulations and in the contract, was a breach of the contract.